**2017-1147**

# United States Court of Appeals
# for the Federal Circuit

INTELLECTUAL VENTURES I LLC, INTELLECTUAL VENTURES II LLC,

*Plaintiffs-Appellants,*

*v.*

ERIE INDEMNITY COMPANY, ERIE INSURANCE EXCHANGE,
ERIE INSURANCE PROPERTY & CASUALTY COMPANY,
ERIE INSURANCE COMPANY, FLAGSHIP CITY INSURANCE COMPANY,
ERIE FAMILY LIFE INSURANCE COMPANY,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Western District of
Pennsylvania in No. 1:14-cv-00220-MRH, Judge Mark R. Hornak.*

## BRIEF FOR APPELLANTS

<table>
<tr>
<td>

DEREK T. GILLILAND
NIX PATTERSON & ROACH, LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333
dgilliland@nixlaw.com

</td>
<td>

CHRISTIAN JOHN HURT
NIX PATTERSON & ROACH, LLP
1845 Woodall Rogers Freeway
Suite 1050
Dallas, TX 75201
(972) 831-1188
christianhurt@nixlaw.com

</td>
</tr>
</table>

*Counsel for Appellants*

JANUARY 17, 2017

# United States Court of Appeals
# for the Federal Circuit

*Intellectual Ventures I LLC, et al v. Erie Indemnity Company,* et al
2017-1147

## CERTIFICATE OF INTEREST

Counsel for Appellant, Christian Hurt, certifies the following:

1. The full name of every party or amicus represented by me is:

Intellectual Ventures I LLC
Intellectual Ventures II LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4. The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Derek Gilliland, Ed Chin (former), Kirk Voss, Christian J. Hurt, Winn Cutler, Ross Leonoudakis, Andrew Wright (former), Nix Patterson & Roach L.L.P.; Henry M. Sneath, Robert L. Wagner, Picadio Sneath Miller & Norton, P.C.


DATED: January 17, 2017          Respectfully submitted,

_____
CHRISTIAN HURT
*Attorney for Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

STATEMENT OF RELATED CASES ................................................1

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES .........................................................1

STATEMENT OF THE CASE .............................................................2

    I.    Intellectual Ventures and the Technology of the '298 Patent...............2

        A.    File Detection Processes in the 1990s Could Not Effectively Detect Certain Types of Unauthorized Files...........3

        B.    The '298 Patent Discloses and Claims a New and Unconventional Software Process to Identify Certain Types of Unauthorized Files.......................................................5

        C.    The Patent Office Expressly Considered the '298 Claims Under the Machine-or-Transformation Test and Has Issued a Patent From the '298 Patent Family Post-*Alice*...........9

        D.    The PTAB Has Concluded That the '298 Patent Does Not Claim a Covered Business Method...........................................10

    II.    The Proceedings Before the District Court.........................................11

        A.    Erie Declines to File a Motion Challenging the Eligibility of the '298 Patent......................................................................12

        B.    The Court Provides Erie a Second Chance to File a Motion to Dismiss on Patent Eligibility and Holds the Case in Abeyance ....................................................12

        C.    The Court Grants Erie's Motion to Dismiss .............................12

i

1.    The Court Determines That a Complete Record
      is Not Required to Grant Erie's Motion ...........................13

2.    The Court Concludes That the Claims Are Directed to
      the Abstract Idea of Identifying and Categorizing Files
      Based on a Set of Predetermined Criteria.......................13

3.    The Court Holds That the '298 Patent Lacks an
      Inventive Concept...........................................................14

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT .......................................................................................18

I.    Standard of Review..........................................................18

II.   The '298 Patent Claims Patent-Eligible Subject-Matter....................18

      A.    File Identification Software That Analyzes and Identifies
            Unauthorized Files in Not an Abstract Idea ............................18

            1.    The Claimed File Identification Software Provides a
                  Specific Improvement in How Computers Detect
                  Unauthorized Files .......................................................20

            2.    The District Court Erred When It "Boiled Down"
                  the Claims to Remove the Inventive Technology..........24

            3.    The District Court Incorrectly Concluded That
                  Humans Could Perform the Functionality Claimed
                  in the '298 Patent .........................................................26

      B.    The Claims Provide an Inventive Concept—Novel
            File Identification Software That Analyzes and Identifies
            Files in Unconventional Ways.................................................29

            1.    The Claims Detail a Narrow, Specific, and Eligible
                  Process of How to Identify Unauthorized Files .............31

2.    The Evidence Shows That the Claimed Functionality
is Unconventional and That the District Court's
Unsupported Findings Were in Error ..............................33

3.    The District Court Improperly Shifted the Burden to
Intellectual Ventures to Prove an Inventive Concept.....35

C.    The Patent Office's Consideration of Eligibility During
Prosecution Strongly Suggests That the '298 Patent
Claims Patent-Eligible Subject-Matter.....................................37

D.    The *Symantec* Decision Does Not Apply to This Case............39

III.    The District Court Erred When It Granted Erie's Motion
Without Considering a Complete Record............................................41

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................43

## ADDENDUM

District Court Opinion, Dated August 4, 2016.................................................Appx1

U.S. Patent No. 7,757,298 ...........................................................................Appx21

# TABLE OF AUTHORITIES

## Cases

*Alice v. CLS Bank*,
　　134 S. Ct. 2347 (2014) ................................................................ 10, 18, 29

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
　　841 F.3d 1288, 2016 LEXIS 19593 (Fed. Cir. 2016). ..................... 19, 20, 32

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
　　725 F.2d 1350 (Fed. Cir. 1984) ....................................................... 37

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
　　827 F.3d 1341 (Fed. Cir. 2016) ..................................................... 29, 33

*Bell Atlantic Corp. v. Twombly*,
　　550 U.S. 544 (2007) ...................................................................... 36

*Bilski v. Kappos*,
　　561 U.S. 593 (2010) ...................................................................... 37

*Cadence Pharms., Inc. v. Exela PharmSci Inc.*,
　　780 F.3d 1364 (Fed. Cir. 2015) ....................................................... 38

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
　　717 F.3d 1269 (Fed. Cir. 2013) (en banc) ......................................... 40

*Content Extraction & Trans. LLC v. Wells Fargo Bank, Nat'l Assn.*,
　　776 F.3d 1343 (Fed. Cir. 2014) ....................................................... 18

*DDR Holdings, LLC v. Hotels.com, LP.,*
　　773 F.3d 1245 (Fed. Cir. 2014) ..................................................... 19, 33, 39

*Enfish, LLC v. Microsoft Corp.*,
　　822 F.3d 1327 (Fed. Cir. 2016) ................................................... 18, 20, 23, 25

*Finjan, Inc. v. Blue Coat Sys., Inc.,*
　　2015 U.S. Dist. LEXIS 158198 (N.D. Cal. Nov. 20, 2015) ..................... 22

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008) (en banc)......................................................10

*In re Cyclobenzaprine Hydrochloride Extended-Release
Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012)....................................................................37

*In re TLI Commc'ns LLC*,
    823 F.3d 607 (Fed. Cir. 2016)......................................................................24

*Intellectual Ventures I LLC v. Symantec Corp.*,
    100 F. Supp. 3d 371 (D. Del. 2015)..............................................................13

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)..............................................13, 39, 40, 41

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015)..............................................................18, 41

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ....................................................................................29, 42

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)...........................................................*passim*

*Microsoft Corp. v. i4i Ltd. P'Ship*,
    131 S. Ct. 2238 (2011) ..................................................................................36

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
    719 F.3d 1346 (Fed. Cir. 2013)....................................................................37

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008).....................................................................38

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014)..........................................................................41

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015)....................................................................36

## **<u>Statutes & Rules</u>**

28 U.S.C. § 1295(a)(1) ......................................................................... 1,15

35 U.S.C. § 101 ............................................................................. *passim*

35 U.S.C. § 282 .................................................................................. 36

## STATEMENT OF RELATED CASES

This appeal arises from the same District Court proceeding as *Intellectual Ventures I LLC v. Erie Indemnity Co.*, No. 16-1128, which is pending in this Court. The District Court proceeding in both cases is *Intellectual Ventures I LLC v. Erie Indemnity Co.*, No. 2:14-CV-220-MRH (W.D. Pa.).    The Patent-in-Suit, U.S. Patent No. 7,757,298 ("the '298 Patent") is also subject to a petition for *Inter Partes* Review before the Patent Trial & Appeal Board ("PTAB").    *Symantec Corp. v. Intellectual Ventures I LLC*, IPR2016-01433.    A decision on whether to institute proceedings is expected while this appeal is pending.    Counsel for Appellants is not aware of other cases pending in this or any other court that will directly affect or directly be affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This appeal arises from the District Court's entry of a final order of dismissal in *Intellectual Ventures I LLC v. Erie Indemnity Co.*, No. 2:14-CV-220-MRH (W.D. Pa.).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

This appeal raises two issues relating to the District Court's Rule 12(b)(6) dismissal of IV's complaint based on Erie's patent-eligible subject-matter defense.

1.    <u>Patent-Eligible Subject-Matter</u>. The '298 Patent claims a file identification software application that applies a new approach to analyzing digital

attributes of files to determine if they are likely unauthorized (*e.g.*, pirated software or music). That novel software application identifies unauthorized files that prior art processes—both manual and automatic—could not detect. The inventor disclosed the software application's source code to the Patent Office and argued during prosecution that his new file detection approach distinguished these claims from the prior art. The Patent Office also expressly considered the claims under the machine-or-transformation test during prosecution and allowed them. On this record, did the District Court err when it concluded—at the Rule 12 stage—that the '298 Patent fails to claim patent-eligible subject-matter?

2. <u>Resolution of Patent Eligibility at the Rule 12(b)(6) Stage</u>. The subject matter of the '298 Patent is complex, and the Patent contains appended source code detailing how to implement the limitations of the claims. The District Court, however, disregarded this evidence. The Court concluded, without supporting evidence, that each limitation was generic and routine and refused to allow IV to develop a record showing otherwise. Did the Court err when it declined to assess eligibility on a complete factual record?

## STATEMENT OF THE CASE

### I.   Intellectual Ventures and the Technology of the '298 Patent

IV was founded in 2000 on the fundamental premise that inventions are valuable. Appx73. To build on that premise and create a marketplace for

inventions, IV primarily engages in three lines of business: it creates inventions and files patent applications for those inventions; it collaborates with others to develop and patent inventions; and it acquires and licenses patents from individual inventors, universities, and other institutions. *Id.*

IV has acquired more than 70,000 IP assets and, in the process, has paid inventors more than half a billion dollars for their inventions. Appx74. The patent at-issue in this case, the '298 Patent, flows from those acquisition activities. *Id.*

The '298 Patent is entitled "Method and Apparatus for Identifying and Characterizing Errant Files." Appx21, '298 Patent, at (54). It issued in 2010 and claims priority to a series of provisional applications filed in 1999. *Id.* at (60), (45). The Patent is directed to specific and unconventional computer software functionality that scans and detects unauthorized files on a computer network.

### A.    File Detection Processes in the 1990s Could Not Effectively Detect Certain Types of Unauthorized Files

When the inventor filed the applications that led to the '298 Patent, Internet hosting companies faced a significant problem: "widespread abuse of Web server space in which users upload files that are offensive, illegal, unauthorized, or otherwise undesirable and thus wasteful of storage resources." Appx29, '298 Patent, col. 1 ll. 43–45. Companies faced similar risks from its users—employees storing illegal material on corporate networks could subject the company to

liability.  *See id.* at col. 1 ll. 54–56.  Detecting and removing these files was a significant administrative burden, especially as the ways to hide unauthorized data in the file system became more sophisticated.  *Id.* at col. 1 ll. 51–53.

At the time, system administrators used manual and automated processes to review files and determine if they were unauthorized.  Appx29, '298 Patent, col. 1 ll. 57–59.  Many unauthorized files, however, escaped detection.  And while an administrator could attempt to manually review the content of each file on a network, that approach was not feasible and was inaccurate—the administrator would still miss certain types of unauthorized files.  *Id.* at col. 1 ll. 61–63.

The Patent describes certain types of unauthorized files that prior art systems could not reliably detect.  First were those that were "split [] into parts so that (i) they cannot be detected by simple searches for large files, and (ii) they can be downloaded or uploaded in smaller chunks so that if a transfer is interrupted, the entire download or upload is not lost."  Appx29, '298 Patent, col. 1 l. 67–col. 2 l. 4.  Further concealing those files was that "[t]he split files may also be renamed so as to hide their true file type," *e.g.*, renaming the file "song.mp3" to "song.txt" would defeat a search for oversized music files.  *Id.* at col. 2 ll. 4–8.

Another way that unauthorized files evaded detection was by hiding unauthorized data beyond the end-of-data marker location of legitimate files.  Appx29, '298 Patent, col. 2 ll. 9–26.  Each file contains a marker that indicates the

end location of the data within the file. To hide an unauthorized file, a user could divide the file into multiple parts and then append each part to a different legitimate file, such as an image on a webpage. *Id.* at col. 2 ll. 10–20. This unauthorized data would escape manual review because the image files appear legitimate and the computer will display the images. *Id.* at col. 2 ll. 20–23. Review based on file name or file size could not reliably identify these files, as each file may only contain a small amount of appended data and the file name may not indicate that the file contains unauthorized data. *Id.* at col. 2 ll. 23–26.

### B. The '298 Patent Discloses and Claims a New and Unconventional Software Process to Identify Certain Types of Unauthorized Files

The '298 Patent solves these limitations with conventional systems. It provides a specific way to accurately and reliably detect the unauthorized files that prior art methods missed—including renamed files, files broken into multiple parts, and files that reside after the end-of-data marker within legitimate files. The patent provides that solution using specific, unconventional server-based software, the "file identification application" depicted below.



Appx23, '298 Patent, Fig. 1 (highlighting added).

The file identification application analyzes files within the network and determines if the file is potentially unauthorized. The specification discloses seven inquiries that the application performs, many designed to catch the files that escaped the prior art processes:

- ***Are the files named sequentially?*** (computer files are often named sequentially to hide unauthorized file data)

- ***Do groups of files have identical sizes where the total size exceeds a threshold number of bytes?*** (unauthorized files are often broken down into smaller, identically sized segments to avoid detection)

- ***Does the file contain suspect tags, such as a suspect cyclic redundancy code (CRC)?*** (certain tags indicate that the file is unauthorized because it may have been reassembled from a series of smaller files)

6

- ***Is the file referenced or linked in a webpage hosted by the server?*** (linked and referenced files are less likely to be unauthorized)

- ***Does the file contain a copyright notice?*** (copyrighted files are more likely to be unauthorized)

- ***Does the content of the file match the indicated file type?*** (mismatched files, *e.g.*, a "song.txt" file that contains audio data, are more likely to be unauthorized)

- ***Does the file contain data past of the end-of-data marker in the file?*** (files that contain data past the end-of-data marker are more likely to contain unauthorized data)

Appx24–25, '298 Patent, Figs. 2A, 2B. If these criteria yield a suspicious file, the file identification application then compares the suspicious file to a list of known unauthorized, errant, or malicious files. The application uses a digital-signature comparison technique, such as a "checksum." *E.g.*, Appx33, '298 Patent, col. 9 ll. 10–53. If the application produces a match—*i.e.*, the digital signature generated for the selected file matches the signature for a known unauthorized file—it marks the file as unauthorized and causes the file to be deleted, reported, quarantined, or the like. Appx26, '298 Patent, Fig. 2C; Appx32, '298 Patent, col. 8 ll. 31–32.

In addition to detailing the software functionality in the specification, the inventor provided the application's source code. Appx30, '298 Patent, col. 4 ll. 27–29 ("Source code for a preferred embodiment of a file identification application is attached hereto as an exhibit"); Appx199–250 (file identification application

source code).  That source code, written in Perl, shows how to implement the file identification application.

While the specification discloses seven selection criteria, the '298 Patent claims are directed to utilizing only three of those criteria (highlighted below) in combination with the digital-identification-based approach.  Claim 10 claims a computer system that contains the file identification application:

> 10. A computer system, comprising:
>
> a server having a memory connected, thereto, said server being adapted to be connected to a network to permit remote storage and retrieval of data files from the memory; and
>
> a file identification application operative with the server to identify unauthorized files stored in the memory, the file identification application providing the functions of:
>
>> selecting a file from a plurality of files stored in the memory, wherein selecting the file is performed according to at least one of:
>>
>>> *selecting the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold*;
>>>
>>> *selecting the file based on whether content of the file matches a file type indicated by a name of the file*; or
>>>
>>> *selecting the file based on whether the file comprises data beyond an end of data marker for the file*;

generating an identification value associated with the selected file, wherein the identification value is representative of at least a portion of the content of the selected file;

comparing the generated identification value to one or more identification values associated with one or more of a plurality of unauthorized files; and

characterizing the file as an unauthorized file if the identification value matches one of the plurality of identification values associated with the unauthorized files.

Appx35, '298 Patent, claim 10 (emphases supplied).[1]   Claim 1 details the operations of the "file identification application" recited in claim 10.  Appx34, '298 Patent, claim 1.  Claim 16 contains similar limitations.  Dependent claims further refine the identification process (using a checksum in a specific way) and the software processes that may occur after a file has been detected (such as presenting it for manual review, sending an automatic notification, or deleting the file).  *E.g.*, Appx34–35, '298 Patent, claims 3–9.

### C.    The Patent Office Expressly Considered the '298 Patent Under the Machine-or-Transformation Test and Has Issued a Patent From the '298 Patent Family Post-*Alice*

The '298 Patent claims underwent examination for almost five years, due primarily to delays at the Patent Office.  *See* Appx21, '298 Patent, at (*) (extending

---

[1] All emphases are supplied unless otherwise noted.

patent term by almost four years, subject to a terminal disclaimer). During that time, this Court issued its *en banc* decision in *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc), which adopted the machine-or-transformation test for eligibility. After that decision, the Patent Office rejected the pending method claims under *Bilski* and based on a prior art reference, among other rejections. Appx256–262. The inventor disagreed and amended the claims to add a limitation reiterating the computer-nature of the invention, as well as the three specific "selecting" steps. Appx271–273; Appx 280–282. The Patent Office then issued the Patent.

The Patent Office similarly continued to issue patents from the '298 Patent family after the *Bilski* decision and after *Alice v. CLS Bank*, 134 S. Ct. 2347 (2014). In 2012, the Patent Office granted a patent that issued from a divisional application of the '298 Patent application. Appx290. In 2015, the Patent Office allowed the grandchild patent of the '298 Patent application. Appx307; Appx317; *see also* U.S. Patent No. 9,239,924 (issue date of January 19, 2016).

### D.     The PTAB Has Concluded That the '298 Patent is Not a Covered Business Method

The '298 Patent has also survived petitions to institute review at the PTAB. In particular, PNC Bank (represented by Erie's counsel) petitioned the PTAB in 2014 to instituted Covered Business Method ("CBM") Review of the '298 Patent. Appx323; Appx336. PNC asserted that the claims were not patent-eligible.

Appx327.  PNC also submitted an expert declaration discussing the relevant art of the '298 Patent, Appx344, the level of skill in the art, Appx345, the proper construction of ten claim terms, Appx358–365, and the expert's opinions on patent eligibility, Appx347.

The PTAB, however, declined to institute CBM Review because the '298 Patent was not a "covered business method patent" under the statute, Appx323; Appx332–333; Appx335–336—*i.e.*, it did not "claim[] a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service," Leahy-Smith America Invents Act ("AIA"), Section 18(d)(1), Pub. L. No. 112-29, 125 Stat. 284 (2011).  The PTAB did not address the merits of PNC's patent-eligible subject-matter challenge.

## II.    The Proceedings Before the District Court

Beginning in June, 2014, IV contacted Erie to discuss a license to IV's patent portfolio.  Appx76.  Erie never responded to IV's overtures, and IV brought this suit in August, 2014.  *Id.*  IV alleged that Erie infringed the '298 Patent along with three additional patents.  Appx76–80.

### A.    Erie Declines to File a Motion Challenging the Eligibility of the '298 Patent

Erie chose not to file a Rule 12(b)(6) motion on the eligibility of the '298 Patent.    It instead alleged that IV's infringement allegations did not provide sufficient notice under Federal Rule of Civil Procedure 8 (under *Iqbal* and *Twombly*), among other challenges.    *Intellectual Ventures I LLC v. Erie Indemn. Co.*, 134 F. Supp. 3d 877, 881, 881 n.8 (W.D. Pa. 2015).    After addressing Erie's other challenges, the Court ordered Erie to answer the complaint, effectively denying Erie's *Iqbal* and *Twombly* challenge.    *Id.* at 926.

### B.    The Court Provides Erie a Second Chance to File a Motion to Dismiss on Patent Eligibility and Holds the Case in Abeyance

The Court then held a status conference.    Appx82.    Erie indicated at the conference that it now sought to challenge the eligibility of the '298 Patent claims. Appx82–83.    The Court allowed Erie to file an amended motion to dismiss, even though Erie declined to file that motion at the outset of the case.    Appx83–84.    And instead of providing IV with the opportunity to develop a full record, the Court held all deadlines in abeyance and did not open discovery.    *Id.*

### C.    The Court Grants Erie's Motion to Dismiss

The District Court then granted Erie's motion.    The Court reached three conclusions relevant to this appeal.

1.    **The Court Determines That a Complete Record is Not Required to Grant Erie's Motion**

The Court first concluded that it did not need a complete record to assess eligibility, Appx12–14, even though both parties cited materials outside of the pleadings and IV requested a full record, *e.g.*, Appx110 (Erie citing prosecution history); Appx172 (IV citing expert declaration submitted in CBM proceedings). The Court concluded that it did not need to construe the claims to understand the basic character of the invention.  Appx13.

2.    **The Court Concludes That the Claims Are Directed to the Abstract Idea of Identifying and Categorizing Files Based on a Set of Predetermined Criteria**

The Court, after it "boiled down" claim 1, Appx3, held that the '298 Patent is directed to "the abstract idea of identifying and categorizing files based on a set of predetermined criteria," Appx15.  The Court did not consider all the limitations in claim 1 or the limitations in claim 10, which expressly claims the file identification application.  *See id.*  The Court concluded that the *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371 (D. Del. 2015) case, which involved a different IV patent (the '050 Patent), applied to this case.[2]  Appx8; Appx15.

---

[2] This Court has since affirmed the district court's decision in *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) ("*Symantec*").

The Court also concluded that the '298 Patent "merely claims a computerized solution to a longstanding problem that exists outside of computers: identifying and categorizing illicit files, the possession of which might subject an individual or organization to liability." Appx15 (citing Appx29, '298 Patent, col. 1 ll. 53–56). The Court found that humans could perform the operations of the '298 Patent and analogized the claimed functionality to a librarian identifying, marking, and removing pornographic material from a library. Appx16.

### 3.    The Court Holds That the '298 Patent Lacks an Inventive Concept

Turning to *Alice* step two, the Court determined that the claims lacked an inventive concept because they could be implemented on generic computers. Each limitation, in the Court's view, recited "generic functions," Appx17, "routine functions," Appx18, and steps that are "just what computers do," *id.* The Court did not cite evidence to support those findings.

The Court also concluded that the source code attached to the Patent was not relevant because, even though claim 10 recites a "file identification application," the Patent "does not claim the source code itself, but the process." Appx18; Appx19 ("[T]he source code is not specifically claimed."). Putting the burden on IV to demonstrate eligibility, the Court found that "Intellectual Ventures asserts

nothing, except for the bald suggestion, that the software is novel. That is insufficient to provide an inventive concept." Appx18.

The Court then addressed the Patent Office's consideration of the claims under the machine-or-transformation test. Appx19. The Court concluded that the Patent Office's allowance of the claims under that test was of limited value because it occurred pre-*Alice*. *Id.*

*      *      *      *      *

In sum, the District Court found the claims ineligible because "[t]he abstract idea claimed in the '298 Patent is implemented on a generic computer, is directed to patent-ineligible subject matter, and lacks an inventive concept." Appx19–20. The Court then entered an order dismissing IV's case with prejudice. Appx472.

IV timely appealed. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## SUMMARY OF THE ARGUMENT

The District Court erred when it held that the '298 Patent is not eligible for patent protection. The Patent is not directed to an abstract idea employed using conventional computing functionality. It does not claim a mathematical equation, economic relationship, business practice, or an unbounded method of organizing human activity. It instead claims the type of narrow, specific technical

15

improvement that this Court has previously found eligible in the *DDR Holdings*, *Enfish*, *BASCOM*, *McRo*, and *Amdocs* cases.

The Patent claims an improvement in how computer networks detect undesired files: a file identification software application that analyzes and identifies potentially unauthorized files using a narrow, specific, and unconventional method to flag suspicious files. Underscoring the computer-technology nature of the invention, the inventor submitted to the Patent Office the source code that shows how a computer implements the claimed operations.

That software application detects the types of unauthorized files that prior art detection processes missed: files that had been digitally manipulated in certain ways to conceal the unauthorized data. The method thus constitutes a technical improvement that solves a technical problem.

It is also narrow. The intrinsic record discloses over ten ways to identify potentially unauthorized files—but the claims only cover three of them, coupled with a narrow identification-value-based verification process. The Patent itself shows that the claims are patent-eligible.

The prosecution history further solidifies the eligible nature of the '298 Patent. During prosecution, the Patent Office expressly considered the eligibility of the '298 Patent's claims under the machine-or-transformation test and allowed

them.  The inventor also added key technical limitations and distinguished the prior art on that basis.

This evidence precluded the District Court from granting Erie's Rule 12(b)(6) motion.  But the Court largely ignored it.  It misunderstood the character of the invention, boiling down the claims to remove the central technical limitations, and recasting the invention as a computerized version of a librarian searching for pornographic material in a library.  Then, without supporting evidence, the Court found that each limitation was generic and routine (after improperly putting the burden on IV to demonstrate otherwise and disregarding IV's evidence).  On these erroneous conclusions, the Court invalidated the '298 Patent.  That act was reversible error.

The District Court's procedure also deprived IV of the ability to develop a full record to rebut the Court's unsupported conclusions, including expert testimony.  Thus, while the limited Rule 12(b)(6) record demonstrates that the '298 Patent claims eligible subject matter, at a minimum, IV is entitled to a full record to defend the validity of the '298 Patent.  For these reasons, and the ones detailed below, IV respectfully requests that this Court reverse the District Court's dismissal of IV's complaint.

# ARGUMENT

## I.    Standard of Review

This appeal challenges the District Court's grant of Erie's Rule 12(b)(6) motion to dismiss, which this Court reviews *de novo*.  *Content Extraction & Trans. LLC v. Wells Fargo Bank, Nat'l Assn.*, 776 F.3d 1343, 1346 (Fed. Cir. 2014) (applying Third Circuit law).  This Court also applies *de novo* review to the District Court's holding that the '298 Patent does not claim patent-eligible subject-matter under § 101.  *Id.*

## II.    The '298 Patent Claims Patent-Eligible Subject-Matter

### A.    File Identification Software That Analyzes and Identifies Unauthorized Files is Not an Abstract Idea

The '298 Patent claims are not directed to an abstract idea.  Under the first step of *Alice*, the Court determines whether the claims are directed to an abstract idea.  134 S. Ct. at 2355.  That inquiry "applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).  The inquiry is a meaningful one, presupposing that "a substantial class of claims are *not* directed to a patent-ineligible concept."  *Id.* (emphasis in original).

The '298 Patent claims are not directed to an abstract idea, such as hedging risk, creating a surety obligation, or generically collecting, analyzing, and storing information. *See, e.g.*, *DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (collecting abstract-idea cases); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 2016 U.S. App. LEXIS 19593, at *15–24 (same); *see also* Appx332–335 (concluding that '298 Patent claims were not directed to a "financial product or service" under Section 18(d)(1) of the AIA). The claims are instead directed to file identification software that improves how computer networks identify and remove unauthorized files.

The claims recite three specific criteria that the file identification application performs to identify potentially unauthorized files: (1) whether the aggregate byte size of a number of identically-sized files exceeds a threshold; (2) whether the data contents of the file do not match the file type that is indicated by the name of the file; and (3) whether the file contains data beyond the end-of-data marker within the file. *E.g.*, Appx35, '298 Patent, claim 10. If one of those conditions is met, the software generates an identification value associated with the selected file (*e.g.*, a checksum) and compares that value to the identification values for known unauthorized files. *Id.* If the software finds a match, it characterizes the selected file as unauthorized. *Id.* The inventor submitted to the Patent Office the source code for this new, inventive software. Appx199–250.

19

This type of specific software claim—which details how to detect potentially unauthorized files using a specific process and set of criteria—focuses on "a specific means or method that improves the relevant technology." *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). It is not broadly drawn to invoking "generic processes and machinery" to create "a result or effect that itself is the abstract idea," *i.e.*, the idea of identifying unauthorized files using computers. *Id.*

The '298 Patent claims therefore fall on the eligible side of the *Alice* step-one line. *E.g.*, *McRo*, 837 F.3d at 1314 (holding that claims "focused on a specific asserted improvement in computer animation, *i.e.*, the automatic use of rules of a particular type" were not directed to an abstract idea); *Enfish*, 822 F.3d at 1335–39 (upholding, under *Alice* step one, the eligibility of claims drawn to a "self-referential table" that detailed the structure of the table).

### 1. The Claimed File Identification Software Provides a Specific Improvement in How Computers Detect Unauthorized Files

The '298 Patent improves upon how computer systems detect unauthorized files that are hidden within the computer file system. Claims that are "directed to an improvement in computer functionality" are generally not directed to an abstract idea. *Amdocs*, 2016 U.S. App. LEXIS 19593, at *26 (citing *Enfish*, 822 F.3d at 1335). The '298 Patent claims clear that bar.

20

Prior to the '298 Patent, existing file detection processes—whether manual or automatic—could not reliably detect certain types of unauthorized files. Those unauthorized files that escaped detected included files split into smaller files, especially when those files are renamed, and files hidden as data beyond the end-of-data marker in legitimate files. Appx29, '298 Patent, col. 1 l. 67–col. 2 l. 26.

The '298 Patent provides a file identification application that can reliably detect the unauthorized files that the prior art could not. That application, detailed in the specification and its attached source code, employs specific criteria to flag unauthorized files—aggregate file size limits of a group of files, a mismatch between the file contents and the file type, the existence of data beyond the end-of-data marker, and, if one of those conditions are met, whether the file's digital signature matches that of a known unauthorized file.

That process is not a "computerized solution" to the general problem of identifying unauthorized files. Appx15. It is a concrete improvement in the ability of computers to identify unauthorized files by detecting specific manipulations to computer data, enabling the invention to identify unauthorized files that prior art processes could not reliably detect.

In that way, the '298 Patent claims are like the claims to isolating and removing malicious code discussed in the Patent Office's Subject Matter Eligibility Guidelines. Appx178–180. There, the Patent Office advised that claims

"directed towards physically isolating a received communication on a memory sector and extracting malicious code from that communication to create a sanitized communication in a new data file" were not directed to an abstract idea. Appx180. They were drawn to a concept "inextricably tied to computer technology." *Id.*[3]

The claims here similarly pass muster under *Alice* step one. Like removing malicious code, the '298 Patent claims are directed to using a "file identification application" that detects if a file is unauthorized (*e.g.*, malicious) based on the specific digital attributes of that file (*i.e.*, its "code"): a file is selected as suspicious based on examining the number of bytes in the file, whether the digital contents of the file matches the file extension, whether the data bytes extend beyond the end-of-data marker of the file, and whether there is an identification value (*e.g.*, a checksum) match between the file and a known unauthorized file. That process represents a concrete improvement in how unauthorized computer files are detected.

---

[3] While not binding authority, courts have looked to the Patent Office's eligibility guidelines to assist in determining eligibility. *E.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, Case No. 13-CV-03999-BLF, 2015 U.S. Dist. LEXIS 158198, at *25–32 (N.D. Cal. Nov. 20, 2015) (concluding, following trial, that a method claim "directed towards receiving a downloadable, identifying suspicious or malicious code and generating a security profile, and associating the downloadable with the security profile" was not directed to an abstract idea because it was "similar to the hypothetical claim in the Patent Office's guidance").

The District Court ignored these similarities because, in its view, "[i]llicit files (even those stored on a computer or the Internet) exist wholly apart from their electronic presence." Appx15. But that assertion proves too much. Many computer-specific structures, like "files," take their name from real-world structures (*e.g.*, database records, windows, Internet addresses, rules, communication protocols, electronic mail, user permissions, and programming libraries and procedures).

Computer-focused claims are not drawn to an abstract idea simply because, at a high level, a real-world analog exists. If that were the case, this Court's decisions in *Enfish* and *McRo*—which involved database structures and computer-based lip-synching rules—would have turned out differently. Instead, the Court in those cases rejected attempts to characterize the inventions as computerized versions of their real-world analogs. *Enfish*, 822 F.3d at 1337 ("[T]he claims are not simply directed to any form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database.") (emphasis in original); *McRo*, 837 F.3d at 1314 (rejecting argument that "the automatic use of rules of a particular type" in computer animation "simply use[d] a computer as a tool to automate conventional activity").

The Court should likewise reject the District Court's analysis here. The claimed file identification application software improves upon how computers detect unauthorized files. It is not directed to an abstract idea.

### 2.    The District Court Erred When It "Boiled Down" the Claims to Remove the Inventive Technology

The District Court did not focus on the computer technology embodied in the claims. It instead "boiled down" the claims to remove that technology and express the claims in "non-patentspeak." Appx3. With that reduction, the Court held that the Patent is directed to "the abstract idea of identifying and categorizing files based on a set of predetermined criteria." Appx15. That was error.

It is well-settled that "courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRo*, 837 F.3d at 1313 (quoting *In re TLI Commc'ns LLC*, 823 F.3d 607, 611 (Fed. Cir. 2016)). Indeed, even at step one of *Alice*—not just at step two—a court "must look to the claims as an ordered combination, without ignoring the requirements of the individual steps." *Id.*

The District Court did not follow that authority. It instead improperly oversimplified the claims. It removed key limitations—including the file identification application limitation (claim 10), the three specific selecting steps (every claim), and the details of the generating, comparing, and characterizing

limitations (every claim). That was error: "Describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337.

The District Court's reason for ignoring those limitations was that they were supposed "patentspeak." Appx3. But the file identification application software is the technical backbone of the claimed invention—the claims select potentially unauthorized files in specific ways (at least one of the three selecting limitations) and use a specific identification-value-based process. The inventor disclosed the source code that describes how the application carries out each operation. *E.g.*, Appx216–218 (identifying the file type as compared to its contents); Appx218–220 (determining if files have identical size and, in aggregate, exceed a threshold); Appx224–227 (determining if file contains data past the truncated end of the file).

Moreover, the prosecution history shows that the three specific "selecting" steps were not conventional. During prosecution, the inventor added the steps to the independent claims and argued that those steps differentiated those claims over the prior art. Appx271–273; Appx280–282. The District Court erred when it ignored those inventive limitations. They are not mere patentspeak.

The District Court also did not address the ordered combination of the claimed steps, which was error. *See McRo*, 837 F.3d at 1313. Here, the "selecting," "generating," "comparing," and "characterizing" steps in combination

recite software-driven operations to identify unauthorized files via specific rules and a digital signature generation and comparison. Like the claims upheld in *McRo*, that software "uses a combined order of specific rules that renders information into a specific format that is then used and applied to desired results": a list of unauthorized files for deletion, quarantine, or review. *Id.* at 1315. The combination of elements, which the District Court did not address, further shows that the '298 Patent claims patent-eligible subject-matter.

3. **The District Court Incorrectly Concluded That Humans Could Perform the Functionality Claimed in the '298 Patent**

Lastly, the District Court erred when it found that humans could perform the process claimed in the '298 Patent. First, the Court incorrectly concluded that the Patent "admit[ted]" that humans could perform the claimed steps. Appx16. The Patent does not teach that humans can, for instance, determine if a file contains data beyond the end-of-data marker in a file—*i.e.*, view and read the series of digital bits that comprise a file, identify which 0s and 1s signify the end-of-data marker, and then look for 0s and 1s indicative of content beyond that marker (as opposed to metadata, such as a footer). Nor does the Patent teach that the remaining limitations are performed by humans.

Indeed, the portions of the '298 Patent specification that the Court relied upon to find an admission do not even relate to the claimed functionality. The first

cited portion relates to how the ***prior art*** operated ("using an automated or manual process").  Appx29, '298 Patent, col. 1 ll. 57–59.  The second portion describes what happens ***after*** the claimed process has already completed—if the "selecting" criteria are met but the selected file does not have the same digital signature as a known unauthorized file, it still may be advisable for an administrator to "manually review the file."  Appx32, '298 Patent, col. 8 ll. 10–12.  Those passages do not suggest, let alone admit, that humans can perform the claimed steps.

Second, the District Court's analogy to a librarian executing the claimed process by marking potentially illicit books is inapt.  Appx16.  The '298 Patent indicates that the "selecting" steps are unique to computer file systems:

- determining the aggregate file size (*i.e.*, number of bytes) in identically sized files, Appx31, '298 Patent, col. 5 ll. 23–43; Appx218–220 (source code to detect identically sized files);

- determining if the contents of a file match the file type by, for example, comparing the header structure of the file (*i.e.*, part of its contents) with the file extension, Appx32, '298 Patent, col. 7 ll. 4–25; Appx240 (source code to analyze file header); and

- determining if the file contains bytes of data beyond the end-of-data marker, Appx32, '298 Patent, col. 7 ll. 26–39; Appx224–227 (source code for end-of-data truncation routine).

The specification and source code likewise detail the digital signature generation and comparison steps that the Court did not address in its librarian analogy.  *See* Appx26–28, '298 Patent, Figs. 2C, 3, and 4; Appx30–33, '298 Patent, col. 4 l. 10–col. 10 l. 34; Appx209–213 (source code that performs

checksum processing).   The specification does not suggest that a human could perform those steps.

At root, the District Court concluded that because a human could manually select potentially unauthorized files in other ways, the claimed "selecting" operations merely computerized those manual activities.   But this Court's recent decision in *McRo* rejects that approach to eligibility.

There, prior to the claimed invention, animation artists used a computer to manually adjust a character's facial expressions and synchronize the lip movements to a given audio track.   *McRo*, 837 F.3d at 1303–06.   The invention in *McRo* automated that task.   But, instead of using the same human process, the invention used a specific set of rules to automatically create weight and transition data.   *Id.* at 1307–08, 1314–15.   The computer then utilized that data to automatically adjust the facial expressions of the character and synchronize the expressions with the audio track.   *Id.*

This Court upheld the eligibility of the claims under *Alice* step one.   The Court concluded that—even though the claims automated a task previously performed by humans—the claims focused on an improved rules-based process that was distinct from the process that humans previously performed.   *McRo*, 837 F.3d at 1314–15.   The record lacked any evidence that human artists previously

engaged in the same rules-based process as the claims. *Id.* The claims were thus not directed at an abstract idea.

*McRo* shows that the District Court improperly conflated the claimed operations—which describe one way of identifying unauthorized files—and the result of those operations. It is true that computer administrators could manually review computer files and attempt to identify them as unauthorized. But, like *McRo*, the claims recite a specific way of identifying unauthorized files using specific selection criteria that humans did not use. These claims are likewise eligible for patent protection under step one of *Alice*.

### B.    The Claims Provide an Inventive Concept—Novel File Identification Software That Analyzes and Identifies Files in Unconventional Ways

The '298 Patent claims are not directed to an abstract idea. But if the issue is a close one, *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016), the second step of *Alice* confirms that the claims are eligible for patent protection. The second step looks for an inventive concept—an element or ordered combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012)).

The '298 Patent claims contain an inventive concept. The claims recite novel file identification software that analyzes and identifies files in unconventional ways—applying three specific selection criteria and then performing a digital-signature-based lookup process. Those limitations ensure that the '298 Patent, in practice, amounts to significantly more than a patent on any process for "identifying and categorizing files based on a set of predetermined criteria." Appx15.

The District Court improperly disregarded those key limitations in its analysis and expanded the breadth of the claims. The claims only cover *three* specific criteria upon which to select a file—of the *over twelve* disclosed in the record. They do cover not any type of predetermined criteria.

Moreover, the record indicates that those three criteria were unconventional. Besides being described in the Patent as inventive, those three software steps were added during prosecution in response to a § 101 rejection (under *Bilski*) and to successfully overcome a prior art rejection. If those added steps were simply "just what computers do," Appx18, the '298 Patent claims would have not emerged from the Patent Office.

Rather than address that evidence, the District Court concluded—without supporting evidence—that the claims recited generic functions. Appx17–18. To reach that conclusion, the Court erroneously placed the burden on IV to

demonstrate eligibility.  Finding (wrongly) that IV did not proffer any evidence, the Court invalidated each of the '298 Patent claims.  These decisions were in error and should be reversed.

### 1.    The Claims Detail a Narrow, Specific, and Eligible Process of How to Identify Unauthorized Files

As described above, the claims detail a specific way to identify an unauthorized file—applying at least one of three specific, computer-centric criteria to select a file and using a digital-signature-based approach to determine if the selected file is a known unauthorized file.  That solution is an inventive concept. And it is sufficiently narrow such that it does not, in practice, amount to a monopoly over "identifying and categorizing files based on a set of predetermined criteria."  Appx15.

Indeed, the '298 Patent embodiments teach *seven* computer-focused criteria to select a file as potentially unauthorized—but the Patent only claims *three* of them.  *Compare* Appx24–25, '298 Patent, Figs. 2A–2B *with* Appx34–35, '298 Patent, claims 1 and 10.  The claims also do not cover the additional five selection criteria disclosed in the prior art reference that the Patent Office relied on to initially reject the claims: "(1) patent keywords, (2) filenames, (3) wordmarks, (4) logo images, [and] (5) copyrighted textual passages."  Appx281 (quoting U.S. Patent No. 6,289,341, col. 2 ll. 42–45).  Nor do the claims cover the processes that

the Patent discloses as prior art (*e.g.*, manually reviewing file names).  Appx29, '298 Patent, col. 1 ll. 57–64, col. 2 ll. 23–26.  Of the dozen-plus selection criteria in the record, the claims cover only three—not any pre-determined criteria.

The claims also require more than just the "selecting" limitations, and those limitations are narrow as well.  The claims require a specific way of identifying unauthorized files.  They require an identification-value-based approach to determine if the selected file matches a known unauthorized process.  There are other ways to identify potentially unauthorized files, such as using a matching file name or file size or simply assuming that a file that meets one of the "selecting" criteria is unauthorized.  The '298 Patent does not cover those methods of identifying and characterizing files.  Further, the dependent claims further limit the scope to software that employs checksum-based implementations.  Appx34–35, '298 Patent, claims 3, 4, 5, 13, 14, and 15.

The narrow scope of the claims indicates that they are directed to a narrow, patent-eligible application of any abstract idea.  They do not preempt all—or even most—ways to identify potentially unauthorized files.  And that fact—which the District Court failed to address and is beyond dispute—underscores that the claims are patent-eligible. *See Amdocs*, 2016 U.S. App. LEXIS 19593, at *30 (upholding claims that enhanced data via a distributed architecture at *Alice* step-two stage because, in part, they were "narrowly drawn to not preempt any and all generic

enhancement of data in a similar system"); *McRo*, 837 F.3d at 1315 (upholding eligibility of claims at *Alice* step-one stage because, in part, the "limitations prevent preemption of all processes for achieving automated lip-synchronization of 3-D characters" and the defendants did not show otherwise); *BASCOM*, 827 F.3d at 1350 (noting, at the *Alice* step-two stage, that the claims do not "preempt all ways of filtering content on the Internet; rather, they recite a specific, discrete implementation of the abstract idea of filtering content"); *DDR Holdings*, 773 F.3d at 1259 (upholding eligibility of e-commerce claims where it was "clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by [the challenger]").

The narrow scope of the claims, in view of the record evidence, shows that they are eligible for patent protection.

## 2.    The Evidence Shows That the Claimed Functionality is Unconventional and That the District Court's Unsupported Findings Were in Error

The District Court, instead of focusing on the narrow scope of the claims, concluded that the claimed operations were conventional. But the Court did not cite any supporting evidence for those conclusions—that the operations in the independent claims were "generic functions" that are "just what computers do," Appx17–18, and that the functionalities of the dependent claims were "[a]ll routine

computer functions," Appx18. And the record evidence shows that the Court was in error.

The specification and the attached source code describe the file identification software and its operations as inventive and disclose how the software performs each operation. *E.g.*, Appx31, '298 Patent, col. 5 ll. 23–43; Appx218–220 (source code to detect identically sized files); Appx32, '298 Patent, col. 7 ll. 4–25; Appx240 (source code to analyze file header); Appx32, '298 Patent, col. 7 ll. 26–39; Appx224–227 (source code for end-of-data truncation routine); Appx26–28, '298 Patent, Figs. 2C, 3, and 4; Appx30–33, '298 Patent, col. 4 l. 10– col. 10 l. 34; Appx209–213 (source code that performs checksum processing). This extensive disclosure, which the District Court largely ignored, suggests that the limitations are not conventional, generic, or just what computers do.

Beyond the specification, the prosecution history shows that the three software selection steps are inventive and not conventional. This is because the inventor added these steps during prosecution to obtain allowance of the claims. If there were "nothing inventive about [these functionalities]," Appx18, the Patent Office would not have allowed the claims.

During prosecution, the Patent Office rejected the claims under § 101 (applying the machine-or-transformation test) and as unpatentable over a prior art

reference, among other rejections.  Appx256–262.  At that time, the claims did not include the three selecting steps.  Appx271; Appx273; Appx281–282.

The inventor then amended the claims to add those limitations.  Appx271; Appx273.  In addition to addressing the *Bilski* rejection, the inventor distinguished the prior art reference on the basis that the reference did not disclose any of the three selecting steps.  Appx281–282.  The Patent Office allowed the claims, strongly indicating that the three steps were not routine or conventional when the '298 Patent was filed.

The record establishes that the claimed functionalities are not purely conventional.  The District Court's unsupported findings were thus in error.

### 3. The District Court Improperly Shifted the Burden to Intellectual Ventures to Prove an Inventive Concept

The District Court's unsupported findings flow from it erroneously placing the burden on IV to demonstrate eligibility—and to do so without the opportunity to develop a full summary-judgment record.  The record lacked evidence showing that the claims failed to contain an inventive concept, *i.e.*, that the claims were, in effect, a monopoly on all processes that identify and characterize files using pre-set criteria.  But rather than hold Erie to its burden to make that showing, the District Court required IV to prove the opposite: it held that "Intellectual Ventures asserts

nothing, except for the bald suggestion, that the software is novel. That is insufficient to provide an inventive concept." Appx18. That holding was error.

Erie had the burden to prove its eligibility defense—by clear and convincing evidence—on both *Alice* prongs, and that burden never shifts to IV. Section 101 challenges are subject to the presumption of validity in Section 282 because § 101 defenses "constitute validity and patentability challenges." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1330 (Fed. Cir. 2015). Section 282 governs invalidity challenges. It mandates that "[a] patent shall be presumed valid" and that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Discharging that burden requires clear-and-convincing evidence. *Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2245–46 (2011). At the Rule 12(b)(6) stage, Erie had to show that the '298 Patent claims will not survive an eligibility attack under this framework such that IV's complaint failed to state a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Erie did not meet its burden, as recounted above. Nor did the District Court concluded that Erie had. The Court instead concluded that IV had the burden to show an inventive concept and that it failed to do so. The record evidence, however, demonstrates that the Court's conclusion was wrong on the merits. But the Court's improper burden shifting alone is legal error that precludes an

affirmance. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (holding that "[t]he district court erred . . . by shifting the burden of persuasion" to the patentee to prove nonobivousness); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013) ("[T]he burden of persuasion [on invalidity] . . . never shifts during the course of the litigation.").

### C.    The Patent Office's Consideration of Eligibility During Prosecution Strongly Suggests That the '298 Patent Claims Patent-Eligible Subject-Matter

The Patent Office's consideration of eligibility during prosecution strongly suggests, especially at the Rule 12 stage, that the '298 Patent is eligible for patent protection. The Patent Office expressly considered the eligibility of the '298 Patent method claims in 2009[4] and allowed them under the machine-or-transformation test. Appx256–257; Appx271; Appx 280.

Survival of that test is a useful and important clue that the claims are patent eligible. *Bilski v. Kappos*, 561 U.S. 593, 602, 604 (2010). And without contrary evidence, that finding by the Patent Office alone should have defeated Erie's motion. *See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359

---

[4] The District Court incorrectly stated that the prosecution history evidence is from 2005. Appx19. The Office Action and Response cited to the District Court occurred in 2009. Appx252 (April 2, 2009 Office Action); Appx267 (September 11, 2009 Office Action Response).

(Fed. Cir. 1984) (explaining that when a validity challenger retreads grounds expressly considered by the Patent Office, "he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job"); *Cadence Pharms., Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1375 (Fed. Cir. 2015) ("[S]ince the Examiner initially rejected the claims . . . for essentially the same reasons as defendants now raise, . . . the Patent Office is 'presumed to have properly done its job' when it ultimately allowed the '218 patent.") (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)).

The District Court discounted this evidence because the Patent Office applied the machine-or-transformation test pre-*Alice*.  Appx19.  But *Alice* did not alter or change the machine-or-transformation test, which remains an important clue to eligibility under the Supreme Court's *Bilski* decision.  And whatever daylight exists between *Alice* and the machine-or-transformation test has not had a practical effect on the '298 Patent family: post-*Alice*, the Patent Office issued the grandchild patent of the '298 Patent.  Appx307; Appx317; *see also* U.S. Patent No. 9,239,924 (issue date of January 19, 2016).  Without clear evidence on the other side, the prosecution history evidence required denial of Erie's motion to dismiss.

### D.    The *Symantec* Decision Does Not Apply to This Case

Lastly, the District Court erred when it concluded that the *Intellectual Ventures v. Symantec* decision concerning a different patent (the '050 Patent) applied to this case and rendered the '298 Patent ineligible for patent protection. Appx8; Appx15.[5]  The *Symantec* decision does not apply for at least the following three reasons.

***First***, the '298 Patent claims are not directed to a computerized version of a "long-prevalent practice" performed by humans.  *Symantec*, 838 F.3d at 1314.  In *Symantec*, the Court concluded that the '050 Patent claims were directed to filtering email that contains unwanted content.  838 F.3d at 1313.  That concept, the Court determined, was an abstract idea because the Court found "it was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail."  *Id.*  The '050 Patent, according the Court, "merely applie[d] a well-known idea using generic computers 'to the particular technological environment of the Internet.'"  *Id.* (quoting *DDR Holdings*, 773 F.3d at 1259).

---

[5] The District Court relied upon the district court's decision in *Symantec*.  After the District Court issued its opinion in this case, this Court affirmed the judgment that the '050 Patent claimed ineligible subject matter.  *Symantec*, 838 F.3d at 1313–16.

That analysis does not apply to the '298 Patent.  Its claims are specifically drawn to selecting steps that were not in "long-prevalent practice" prior to the invention.  The Patent itself teaches that prior art detection processes (whether manual or automatic) could not effectively detect unauthorized data that was split into identically sized files, was part of a file renamed to hide the true file type, or was concealed within a legitimate file beyond the end-of-data marker.  Appx29, '298 Patent, col. 1 l. 67–col. 2 l. 26; *see also Symantec*, 838 F.3d at 1317 ("The written description is particularly useful in determining what is well-known or conventional.").  The claims are narrowly drawn to using novel file identification software to detect those abnormalities in the file data.  And the prosecution history further shows that the software's selecting steps are not generic computer operations—the inventor added those steps to obtain claim allowance.

*Second*, the '298 Patent claims do not "use generic computers to perform generic computer functions." *Symantec*, 838 F.3d at 1315.  They instead contain a specific and limiting recitation of improved computer technology—file identification software that provides an improved way to detect unauthorized files that prior art methods could not effectively detect.  *See id.* at 1316 (finding that "[t]here is not, in the '050 patent, any 'specific or limiting recitation of . . . improved computer technology,' as the asserted claims describe only generic computer elements") (quoting *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d

1269, 1286 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring)) (internal citation omitted).  That technological improvement is patent-eligible.

*Third*, the '298 Patent claims "restrict[] how the result is accomplished" and describe the mechanism for doing so.  *Symantec*, 838 F.3d at 1316 (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015)).  The three specific selecting steps (out of the twelve-plus disclosed in the record) coupled with the digital-signature-based identification process significantly restrict how the claimed result—identifying unauthorized files—is accomplished. The specification, along with the attached source code, describes in detail how the software application completes these steps.

The '298 Patent claims patent-eligible subject-matter.  The *Symantec* decision does not alter that outcome.

## III.    The District Court Erred When It Granted Erie's Motion Without Considering a Complete Record

The limited record that IV developed at the motion-to-dismiss stage shows that the '298 Patent is eligible for patent protection.  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.") (citation and quotations omitted).  But if

there were any doubt, the District Court should have determined eligibility on a summary judgment record, including expert testimony.

That type of evidence would assist the District Court in understanding the basic character of the invention, including the unconventional nature of the claim limitations, their computer-network roots, and whether humans can, in actuality, practice the '298 Patent claims. It would also assist in determining whether the '298 Patent "in practice," *i.e.*, in the real world, "amounts to significantly more than a patent upon the [abstract idea] itself," *Mayo*, 566 U.S. at 72–73, here, the idea of detecting unauthorized files.

The technology of the '298 Patent is relatively complex. And, unlike most software patents, the inventor submitted—and disclosed to the public—the underlying source code that, when executed, powers claimed operations. Expert testimony would assist the Court in determining the nature of the limitations embodied in the code—and determine if they were generic, routine functions that computers just perform or specifically programmed operations that improved how computers analyze file system data and detect unauthorized files within a network.

Indeed, Erie recognized that expert testimony addressing the eligibility of the '298 Patent is beneficial. Erie's counsel—when seeking to render ineligible the '298 Patent on behalf of PNC—submitted to the PTAB an expert declaration addressing discussing the relevant art of the '298 Patent, Appx344, the level of

skill in the art, Appx345, the proper construction of ten claim terms, Appx358–365, and the expert's opinions on eligibility, Appx347.

The District Court declined to entertain a full record, concluding that "the Court is comfortable with its ability to give meaning to words like 'selecting' and 'comparing' without the assistance of expert testimony." Appx13. Based on the plain-and-ordinary meaning of those terms, the Court indicated that it understood the basic character of the invention. Appx14.

The Court, however, came to the wrong understanding of the invention, and that understanding led to the wrong eligibility conclusion: the Court oversimplified the claims to remove central limitations, disregarded the source code and its disclosure, and, against record evidence, concluded that each software-based limitation was generic and conventional. A more complete record would have solidified what the Patent, the source code, and the prosecution history already show—that the '298 Patent claims eligible subject matter. It would have further rebutted the District Court's findings and shown the Court's eligibility holdings to be incorrect.

The District Court erred on the merits. At a minimum, however, IV is entitled to a full record from which to defend its property rights.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons detailed above, IV respectfully requests that this Court

reverse the judgment of the District Court holding at the Rule 12(b)(6) stage that the '298 Patent claims fail to claim patent-eligible subject-matter.

Dated: January 17, 2017                Respectfully submitted,

_____
**CHRISTIAN HURT**

**DEREK GILLILAND**
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlaw.com

**CHRISTIAN HURT**
**NIX PATTERSON & ROACH, L.L.P.**
1845 Woodall Rodgers Freeway, Suite 1050
Dallas, Texas 75201
972.831.1188 (telephone)
972.444.0716 (facsimile)
christianhurt@nixlaw.com

*Attorneys for Appellants Intellectual*
*Ventures I LLC and Intellectual Ventures II*
*LLC*

**ADDENDUM**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:14-cv-220 |
| v. | ) ) ) | Judge Mark R. Hornak |
| ERIE INDEMNITY COMPANY, *et al.*, | ) ) | |
| Defendants. | ) ) | |

### OPINION

**Mark R. Hornak, United States District Judge**

Before the Court is a Motion to Dismiss infringement claims as to the last of several patents at issue in this case. ECF No. 132. The Motion argues that this patent, U.S. Patent 7,757,298 (the "'298 Patent") is not drawn to patent-eligible subject matter under 35 U.S.C. § 101. The Plaintiff patent holders disagree and the parties have fully briefed the issue. ECF Nos. 133, 134, 135. The Erie Defendants also brought some supplemental authority to the Court's attention, ECF Nos. 138, 140, about which the Court also heard from the Plaintiffs, ECF Nos. 139, 141. With that excellent briefing, the Court will dispense with oral argument and decide the matter on the papers.

For the reasons stated in this Opinion, the Court concludes that the '298 Patent is drawn to patent-ineligible subject matter and does not clear the *Alice* bar. Therefore, the Erie Defendants' Motion to Dismiss will be granted.

## I.  BACKGROUND

### a.  Earlier Litigation & The Court's First Opinion

By Order of the Court, three related patent infringement cases filed by Plaintiffs Intellectual Ventures I and Intellectual Ventures II LLC ("Intellectual Ventures") were consolidated. ECF No. 50. At issue were four patents held by Intellectual Ventures: U.S. Patent Nos. 6,519,581; 6,510,434; 6,546,002; and the '298 Patent. The various Defendants moved to dismiss the infringement claims against them on § 101 grounds. After full briefing and argument, the Court granted the Motions to Dismiss as to the '581 Patent,[1] the '434 Patent, and the '002 Patent, finding each to be drawn to patent-ineligible subject matter. *Intellectual Ventures I LLC, et al. v. Erie Indem. Co.*, 134 F. Supp. 3d 877, 926 (W.D. Pa. 2015) ("*Erie I*").

That Opinion did not substantively address the '298 Patent because it was not subject to any then-pending Motion to Dismiss. *Id.* at 881 n.8. When the initial Motions to Dismiss were filed, the '298 Patent was subject to invalidity proceedings before the Patent Trial and Appeal Board ("PTAB"). ECF No. 46-1, at 1 n.2. The PTAB declined to initiate an *inter partes* review proceeding against the '298 Patent on 35 U.S.C. §§ 102 or 103 grounds. *See Int'l Bus. Mach. Corp. v. Intellectual Ventures I LLC*, IPR2014-01516 (P.T.A.B. Aug. 24, 2015). Now that that has all been cleared up, the Defendants filed this Motion to Dismiss and the matter is ripe for disposition.

### b.  The '298 Patent

The '298 Patent is titled "Method and Apparatus for Identifying and Characterizing Errant Electronic Files" and is designed to solve the problem of the proliferation of illicit files on

---

[1] More specifically, the Court dismissed the claims as to the '581 Patent for want of subject matter jurisdiction but held in the alternative that if it *had* subject matter jurisdiction, the Court would grant the Motions to Dismiss on patent-ineligibility grounds. *Erie I*, 134 F. Supp. 3d at 926.

2

the Internet (like pornography, pirated music or software, etc.). '298 Patent col. 4 ll. 30–34, 47–

52 (filed June 3, 2005). Claim 1 is representative:

> 1. A computer-implemented method for identifying and characterizing stored electronic files, said method comprising:
>
> under control of one or more configured computer systems:
>
> selecting a file from a plurality of files stored in a computer storage medium, wherein selecting the file is performed according to at least one of:
>
>> selecting the file based on the size of the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold;
>>
>> selecting the file based on whether content of the file matches a file type indicated by a name of the file; or
>>
>> selecting the file based on whether the file comprises data beyond an end of data marker for the file;
>
> generating an identification value associated with the selected file, wherein the identification value is representative of at least a portion of the content of the selected file;
>
> comparing the generated identification value to one or more identification values associated with one or more of a plurality of unauthorized files; and
>
> characterizing the file as an unauthorized file if the identification value matches one of the plurality of identification values associated with the unauthorized files.

'298 Patent col. 12 ll. 21–44 (Claim 1).

In non-patentspeak, the claim can be boiled down to four fundamental steps: (1) selecting

a file; (2) generating a unique value corresponding to the file; (3) comparing that unique value to

a bunch of previously generated values that correspond to different types of illicit files; and (4)

marking the file for deletion or other treatment if its assigned value matches a known one. '298

Patent col. 2 ll. 58–65.

3

The invention purports to "reliably characterize files according to pre-set criteria, that is not easily circumvented, and that reduces the amount of manual review necessary to verify proper operation."[2] '298 Patent col. 2 ll. 42–44. It recognizes various characteristics of files—like being split into parts, illegitimate files appended to legitimate ones, and names that give away illegal, illicit, or offensive content (readers can imagine such names for themselves)—and in so doing, saves Web hosting services from criminal, copyright, or some other liability.

## II. LEGAL STANDARDS

### a. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of cases that fail to state a claim upon which relief can be granted. Complaints must allege facts "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In assessing a motion to dismiss, courts must accept all "well-pleaded facts as true" and disregard any legal conclusions. *Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 556 U.S. at 677).

A "plausible claim for relief" in a patent infringement case necessarily requires a valid patent; otherwise there can be no infringement. And "[w]hether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010). Thus, the 12(b)(6) stage is a proper one at which to examine patent eligibility under § 101.

---

[2] Such manual review, Intellectual Ventures notes, is "usually not *economically* feasible, and is also not entirely effective at identifying undesirable files." '298 Patent col. 1 ll. 61–64. Notably, with its reference to *reducing* the amount of manual review, the '298 Patent presupposes the existence of manual review, and the ongoing use of manual review. *Id.* col. 2 ll. 38–44. More on that later.

4

**b. *Alice* & § 101: The Law**

In general, patents may be granted to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof . . . ." 35 U.S.C. § 101. But there are three categories of exceptions to that broad sweep including "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). It is the "abstract ideas" category with which we are concerned here.

Patent eligibility under § 101 is governed by the two-step framework set out by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (describing "the longstanding rule that an idea of itself is not patentable."). In step one, courts must determine whether the claims at issue are "directed to a patent-ineligible concept." *Id.* Abstract ideas are things like "preexisting, fundamental truth[s]" (like mathematical equations), "method[s] of organizing human activity," or "longstanding commercial practice[s]" (like intermediated settlement or risk hedging). *Id.* at 2356. "[A] relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *TLI Comms. LLC v. AV Automotive, L.L.C.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). But courts must not oversimplify claims because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S. Ct. at 2354 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). In essence, *Alice* step one prompts courts to ask, what are the claims generally trying to achieve? *See Erie I*, 134 F. Supp. 3d at 897–98.

If the claims are directed to a patent-ineligible concept, courts proceed to step two and look for an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to

5

ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1298). "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI*, 823 F.3d at 613. Therefore, the claims must contain more than merely stating an abstract idea and adding the words "apply it." *Alice*, 134 S. Ct. at 2357. Appending "well-understood, routine, conventional activity" won't do, nor will "the mere recitation of a generic computer." *Id.* at 2358–59. At *Alice* step two, the machine-or-transformation test can be a "useful clue" as to patent-eligibility.[3] *See Bancorp Servs. LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). That test asks whether claims are "tied to a particular machine or apparatus" or "transform[] a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008). In so doing, to make a claim patent-eligible, "the use of the machine must impose meaningful limits on the claim's scope," *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011), and "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly," *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332–33 (Fed. Cir. 2010).

The standard is clear enough, but its application is another matter. In recognizing that courts should "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases," *Enfish*, 822 F.3d at 1334, this Court examined the state of § 101 jurisprudence in its first Opinion. *See Erie I*, 134 F. Supp. 3d at 895–907 (collecting cases). The Court will spare the parties another extended canvas of the law, but will discuss a handful of especially relevant recent decisions.

---

[3] Importantly, the machine-or-transformation test "is not the sole test" for whether an invention is patent-eligible. *Bilski v. Kappos*, 561 U.S. 593, 604 (2010).

6

Supplementing the guidance found in cases discussed by this Court in *Erie I*, *see* 134 F. Supp. 3d at 902–07, the Federal Circuit has recently decided several more § 101 cases. For example, in *Enfish*, the Federal Circuit confronted patents that passed muster under *Alice*. *See* 822 F.3d 1327. There, the court found that patents dealing with a "self-referential" database were not directed to an abstract idea. *Id.* at 1336. Instead, the patents were directed to "an innovative logical model for a computer database . . . [*i.e.*,] a model of data for a computer database explaining how the various elements of information are related to one another." *Id.* at 1330. The improvements to a unique computer operation—the self-referential table—grounded the idea in non-abstractness and went beyond generic "storing, organizing, and retrieving memory in a logical table." *Id.* at 1337. In so holding, the Federal Circuit took care to distinguish the patents at issue from others that only added the use of conventional computer components to well-known business practices or mathematical formulae. *Id.* at 1338–39 (collecting cases).

And in *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, No. 2015-1763, 2016 WL 3514158 (Fed. Cir. June 27, 2016), the Federal Circuit encountered another patent that contained a sufficiently "inventive concept" to satisfy *Alice* step two. The claims at issue generally recited a system for filtering Internet content. *Id.* at *6. And although the court held that "filtering content" is an abstract idea at *Alice* step one, the patent contained an "inventive concept" when considering the ordered combination of limitations. *Id.* at *15. That inventive concept is "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* Rather than reciting "the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components" the claims combined the benefits of two

7

existing, unique content filters in a way that "improve[d] an existing technological process." *Id.* at *15–16.

But in *TLI*, 823 F.3d at 609, the Federal Circuit held that a patent which related "generally to an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device" was directed to "the abstract idea of classifying and storing digital images in an organized manner and fail[ed] to add an inventive concept sufficient to confer patent eligibility." Limitations in the patent to tangible components merely "provide[d] a generic environment in which to carry out the abstract idea." *Id.* at 611.

This Court should, and will, also draw from the wisdom of other district courts around the country. The Defendants rely heavily on *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371 (D. Del. 2015). Appropriately so, in the Court's view. Chief Judge Stark's thorough and well-reasoned opinion invalidated on § 101 grounds another of Intellectual Ventures' patents: U.S. Patent No. 6,460,050 (the "'050 Patent") entitled "Distributed content identification system." The *Symantec* court found that the claims were directed to "receiving information related to a file (an identifier) from a querying computer, characterizing the file based on the identifier and other stored identifiers, and communicating a result of the characterization back to a querying computer." *Id.* at 383. Analogizing to the claims in *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014), the court went on to conclude that the '050 Patent was directed to the abstract idea of "receiving identity information, comparing it to other information, and communicating results based on the identifying information." *Symantec*, 100 F. Supp. 3d at 383.

8

Chief Judge Stark bolstered his conclusion that the claims were directed to an abstract idea by analyzing whether the steps of the claims could be performed by human beings in a non-computerized context. *Id.* Like "police officers looking for stolen cars or parking enforcement officers determining how many unpaid tickets belong to owners of illegally parked cars," the claim steps *could* be performed by humans wholly apart from any computer implementation. *Id.* at 384–85. And the *Symantec* court rejected the plaintiff's argument that the claims were saved based on the U.S. Patent and Trademark Office ("PTO") Interim Eligibility Guidelines. *Id.* at 385. Specifically, the court said that "[t]he PTO's hypothetical claim is directed to creating 'sanitized' versions of computer files by 'extracting, via file parsing, the malicious code' from computer files." *Id.* Thus, the Interim Guidelines example was "necessarily rooted in computer technology because malicious code or 'viruses' have no significance outside the realm of computer technology." *Id.*

Finally, under *Alice* step two, the court in *Symantec* found that "uniqueness" and "characterizing" limitations did not add a sufficiently inventive concept. *Id.* at 386–87. Instead, they amounted to "nothing more than a generic computer implementation of the human-executable abstract idea." *Id.* at 386. The court also rejected plaintiff's argument that under the machine-or-transformation test, specialized software or programming added an inventive concept because the claims themselves stated that *any* "hashing algorithm" or "any number of commercial or free e-mail systems, or other data transfer systems in [other] applications" could be used. *Id.* at 387.

In *Asghari-Kamrani, et al. v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2016 WL 3670804 (E.D.V.A July 5, 2016), the court invalidated a patent that "relates to a system and method provided by a Central-Entity for centralized identification and authentication of users

9

and their transactions to increase security in e-commerce." *Id.* at *2. The court concluded that the claims were directed to the abstract idea of "using a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction." *Id.* at *7. And the claims were not directed to a problem unique to computer network authentication because although party authentication "has been magnified by computer and network technology [that] does not make the problem unique to this environment." *Id.* at *10. The claims also failed *Alice* step two because they "have generic computers perform an old method of authentication." *Id.* at *12.

In *American Well Corp. v. Teladoc, Inc.*, No. 1:15-cv-12274, 2016 WL 3255011, at *2, *7 (D. Mass. June 13, 2016), the court concluded that a patent which "monitors, records, and extends services based on the 'present availability' of a medical care provider" was directed to the abstract idea of "connecting a patient with an available doctor." The claims did "not purport to improve the functioning of computer or internet technology itself, nor [did] they address an internet-centric challenge." *Id.* at *7. And at *Alice* step two, the court found no inventive concept because the claims merely implemented the abstract idea with generic and previously-known computer components. *Id.* Specifically, the court held that "accessing and storing information on a data repository, identifying medical service providers in a pool, sending and receiving communications over a computer, and using the Internet to do all of the above" did not make the abstract idea any less abstract. *Id.* (internal alterations and quotations omitted). And just because the claims "automate or otherwise make more efficient" traditional methods or techniques did not render them patent-eligible. *Id.* at *9 (citing *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015)).

In *Visual Memory LLC v. NVIDIA Corp.*, No. 1:15-cv-789, 2016 WL 3041847, at *5 (D. Del. May 27, 2016), the court concluded that a patent claiming a "computer memory system

10

connectable to a processor and having one or more programmable operational characteristics" was directed to the abstract idea of categorical data storage. Interpreting the Federal Circuit's recent decision in *Enfish*, the district court remarked that that decision is "best understood as a case which cautions against oversimplification during step one of *Mayo/Alice*, rather than a case which exempts from § 101 scrutiny all patents which purport to improve the functioning of a computer." *Id.* at *4. Thus, just because the claims touch on improvements to computer capabilities, they were still abstract in that they did not point to a specific or concrete improvement in the way software operates. *Id.* at *5. In considering *Alice* step two, and the Federal Circuit's decision in *DDR Holdings*, the *Visual Memory* court said that the "'rooted in computer technology' heuristic . . . is best understood as a clue that when a solution overcomes a problem specifically arising in a particular technological realm, that solution—though it may implement an abstract idea—may likely contain an inventive concept." *Id.* at *6 (internal alterations and quotations omitted). Thus, the court found that descriptions of generic web servers and attendant software were insufficiently inventive without some explanation of the specific mechanism with which the limitations are achieved. *Id.* at *7.

In *Activision Publishing, Inc. v. xTV Networks, Ltd. et al.*, No. 2:16-cv-737, at 1 (C.D. Cal. July 25, 2016), the court concluded that a patent entitled "Managing, Accessing, and Retrieving Networked Information Using Physical Objects Associated with the Networked Information" was directed to ineligible subject matter. The claims were drawn to the abstract idea of "using information stored in one place to determine the location of and retrieve information stored in a second place." *Id.* at 8. Moreover, the patent lacked an inventive concept because it only "simplifie[d] many aspects of data transfer among physically close individuals"

11

rather than improving the functioning of a computer itself or effecting an improvement in other technology. *Id.* at 14.

And most recently in *VideoShare, LLC v. Google, Inc.*, No. 13-cv-990, slip op. at 9 (D. Del. Aug. 2, 2016), the Court held that two software patents were directed to the abstract idea of "preparing a video in streaming video format for sharing over a computer network." The claims were *not* directed to any improvement in computer functionality largely because the specification did not recite any specific file format conversion software. *Id.* at 12. Indeed, the proprietary software disclosed in one of the patents was "built upon . . . third-party technologies" that provide the conversion technology; no specific algorithms or specific software code was claimed as part of the invention. *Id.* Moreover, the steps claimed in the patents could be performed manually by a human. *Id.* at 13. The court also found that the patents lacked any inventive concept because they "merely recite[d] conventional computer components or functions that involve the use of a computer network." *Id.* at 17.

It is with that background and understanding of the legal landscape that the Court turns to the analysis of the '298 Patent.

### III. ANALYSIS

#### a.  Claim Construction

The Court will deal first with Intellectual Ventures' last arguments: namely that deciding patent-eligibility now is premature because the Court has not heard from experts and has not construed the claims. ECF No. 134, at 20–22. According to Intellectual Ventures, "understanding the software and its associated source code counsels towards allowing a fuller record with expert testimony." *Id.* at 20. Intellectual Ventures wants expert testimony to "explain[] the functionality of the source code [appended to the patent as an exemplary file identification application], . . .

12

what the code would teach a skilled artisan about how to implement the claimed functionality, . . . and whether that source code or the application it is embodied within was 'generic' when the '298 Patent was filed." *Id.* at 21.

That argument goes hand-in-hand with Intellectual Ventures' other procedural argument that claim construction is necessary for terms like "selecting," "generating," "comparing," and "characterizing." *Id.* Intellectual Ventures says that construction of those terms generates a genuine dispute about the basic character of the invention. *Id.* What Intellectual Ventures does not say, however, is why the Court cannot understand the claims terms from the face of the '298 Patent.

"The general rule is . . . that terms in the claim are to be given their ordinary and accustomed meaning." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). And indeed, it is not uncommon for "the ordinary meaning of claim language . . . [to be] readily apparent even to lay judges." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). That is the case here. Claim "construction" of the '298 Patent language would be "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims did "not require elaborate interpretation"). The Court is comfortable with its ability to give meaning to words like "selecting" and "comparing" without the assistance of expert testimony. *Cf. Barry v. Medtronic, Inc.*, No. 1:14-cv-104, at *4 (E.D. Tex. July 19, 2016) (declining expert testimony "in the field of retroactive mind reading of the thoughts of patent examiners" because it would not assist the trier of fact).

Declining to engage in claim construction or to hear from experts is also procedurally appropriate at this stage. *See O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d

13

1351, 1360 (Fed. Cir. 2008) (the Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings"); *Bancorp*, 687 F.3d at 1273 ("claim construction is not an inviolable prerequisite to a validity determination under § 101"); *Erie I*, 134 F. Supp. 3d at 908 ("claim construction is desirable, unless in reviewing the patents at issue, a district court concludes that it isn't.").

Therefore, the Court concludes that the "basic character" of the '298 Patent is evident when the claim terms are given their ordinary and accustomed meanings. Neither expert testimony nor claim construction is necessary to decide this Motion.

### b. *Alice* Step One Application

At *Alice* step one, Erie contends that the '298 Patent is directed to the abstract idea of "identifying and characterizing electronic files." ECF No. 133, at 12. Intellectual Ventures contends that it is not. ECF No. 134, at 13.

Erie analogizes to Chief Judge Stark's *Symantec* opinion, arguing that the '298 Patent's claims describe "using conventional computing technology to identify potentially suspect files using attributes indicative of illicit content, comparing each of the suspect files to a list of known unauthorized files, and characterizing a suspect file as 'unauthorized' it if matches a known unauthorized file." ECF No. 133, at 12. Intellectual Ventures counters that the claims are actually directed to "specific computer technology—a particular way to scan computer files on computer networks to identify unauthorized files based on certain digital attributes of the files." ECF No. 134, at 13. Further, Intellectual Ventures argues, the claims solve a problem unique to computer systems: "identifying unauthorized or malicious computer data that a user has hidden by modifying the attributes of computer files on the network" using a file identification application.

14

*Id.* Intellectual Ventures analogizes to the PTO's Interim Guidelines that say "isolating and removing malicious code from electronic messages" is not an abstract idea. *Id.* at 14.

The Court concludes that Erie has the better of the argument and that Chief Judge Stark's analysis applies here. The '298 Patent is directed to the abstract idea of identifying and categorizing files based on a set of predetermined criteria. Unlike the patent-eligible claims from *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014); *Enfish*, 822 F.3d 1327; and *BASCOM*, 2016 WL 3514158, the '298 Patent does not solve a computer-centric problem or a problem that is unique to computers. The '298 Patent does not deal with computer viruses or relational databases or anything "necessarily rooted in computer technology." Instead, it merely claims a computerized solution to a longstanding problem that exists outside of computers: identifying and categorizing illicit files, the possession of which might subject an individual or organization to liability. *See* '298 Patent col. 1 ll. 53–56. Intellectual Ventures' analogy to malicious computer code is inapt. It is true that the claims purport to use computer code to determine *if* a file is unauthorized based on the digital attributes of the file. But that computerization of the solution is not enough to prevent the underlying idea from being abstract. *See Erie I*, 134 F. Supp. 3d at 921 ("the fact that [manual processes] would be slower and less accurate does not change the analysis.") (citing *OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.")). Illicit files (even those stored on a computer or the Internet) exist wholly apart from their electronic presence—pornography and pirated music, for example could take many non-electronic forms even when they are stored electronically. Pictures can be printed and music can be listened to from a CD or cassette tape.

15

Indeed the functions performed by the '298 Patent could be performed by humans. *See Symantec*, 100 F. Supp. 3d at 383 ("[a]nother helpful way of assessing whether the claims . . . are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings") (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)). The '298 Patent itself admits as much. '298 Patent col. 1 ll. 57–59, col. 8 ll. 10–12 ("Such files can be selected for review and characterized as acceptable or unacceptable . . . using [a] . . . *manual* process") (emphasis added). While it may be time-intensive and laborious, files could be physically examined with set criteria and marked for disposition.[4]

Imagine a librarian tasked with marking and removing books containing pornographic material from a library. The librarian could select books to examine based on specific criteria. Perhaps books that are bigger or broken into volumes are more likely to contain such illicit material. Or the librarian could look for certain terms in the books' titles, or the name of a publisher. Or she could look for books that contain more pages of pictures than pages of words. All of these are set criteria that could be readily and mechanically employed, resulting in predictable, self-evident conclusions. The librarian could then mark those books with a red sticker, indicating they are to be removed. That is the process claimed in the '298 Patent, executed physically rather than on a computer.

---

[4] Of course the criteria doesn't necessarily have to be the same (digital attributes like whether a file is broken up), but it certainly could be (the name of the file, the size of the printout, etc.). The '298 Patent claims "at least one of" file size, whether the content of the file matches the file type or name of the file, and whether there is "data beyond an end of data marker for the file." '298 Patent col. 12 ll. 27–34. But those criteria have analog analogs. Physical "files" like books have sizes and names and can have "data" appended to them (*i.e.* a book with a CD attached to the back cover). So the '298 Patent does not claim criteria that are "necessarily rooted in computer technology."

16

So while malicious computer code and "viruses" and relational databases exist only because computers exist, illicit files do not (and they existed long before computers became ubiquitous[5]). Thus, the claimed process of identifying and categorizing them is an abstract idea.

### c. *Alice* Step Two Application

Having determined that the '298 Patent is directed to an abstract idea, the Court will look for an "inventive concept" at *Alice* step two. Erie argues that the '298 Patent lacks an inventive concept because it "merely uses . . . conventional [computer] components[6] for their basic functions: data collection, recognition, comparison, and storage (or deletion from storage)." ECF No. 133, at 15–16. Intellectual Ventures argues that there *is* an inventive concept because "each claim recites specific computer-implemented steps to identify and characterize electronic files" and because "[d]ependent claims further limit the scope to software that employs checksum-based implementations." ECF No. 134, at 16.

Intellectual Ventures' arguments, however, are misplaced. First, that the claims recite specific computer-implemented steps is not enough to supply an inventive concept. *See Alice*, 134 S. Ct. at 2357 ("The introduction of a computer into the claims does not alter the analysis. Neither [does] stating an abstract idea while adding the words 'apply it.'") (citing *Mayo*, 132 S. Ct. at 1294). The steps specified by Intellectual Ventures (selecting files based on file size, a mismatch between the content and file type, the existence of data beyond the end of a data marker within the file, and the match of a specific identification value; generating a specific identification value; and determining if that value matches another value) are generic functions,

---

[5] *See Stanley v. Georgia*, 394 U.S. 557, 568 (1969) ("We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime.").

[6] The components cited in the '298 Patent are: "configured computer systems," "a computer storage medium," "a server," "a memory," "a file identification application," "a network," and "a non-transitory computer-readable storage medium."

17

even if performed by a computer. *See id.* at 2359 ("conventional computer activities or routine data-gathering steps . . . are 'well-understood, routine, conventional activit[ies] previously known to the industry.'") (quoting *Mayo*, 132 S. Ct. at 1294); *see also buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Bancorp*, 687 F.3d at 1278 (a computer "employed only for its most basic function . . . does not impose meaningful limits on the scope of those claims."). Selecting files based on identifiers and matching different files/identifiers is just what computers do. There is nothing inventive about it.[7]

Second, the dependent claims—revolving around the appended sample source code—do not provide meaningful limitations. Those claims only specify the type of identification value ("checksum") generated, the type of files that might be selected, or the processing the files will undergo. *See* '298 Patent col. 12 ll. 45–67, col. 13–14. All are routine computer functions. And the appended source code does not save the claims either. *See id.* col. 9 ll. 10–11 ("There are numerous possible algorithms that may be utilized to generate a checksum."). Like in *VideoShare*, No. 13-cv-990, slip op. at 12, the '298 Patent does not claim the source code itself, but the process. The source code is exemplary and does not provide an inventive concept. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method."); '298 Patent col. 4 ll. 27–29 (indicating the source code is a "preferred embodiment of a file identification application"). Intellectual Ventures asserts nothing, except for the bald suggestion, that the software is novel. That is insufficient to provide an inventive concept.

---

[7] This conclusion is bolstered by the language of the '298 Patent itself. "The user computer 120 may be *any type of computing device* that allows a user to interactively browse websites." '298 Patent col. 3 ll. 44–48 (emphasis added).

18

Finally, Intellectual Ventures argues that the '298 Patent clears the *Alice* step two bar under the machine-or-transformation test. ECF No. 134, at 10. Specifically, Intellectual Ventures argues that the '298 Patent "provides for novel software—a technological improvement—that executes the claimed operations and creates a new machine as a result." *Id.* at 16. Erie counters that "[c]omputers have long been used to select files based on a variety of criteria, including size, name, and type, as well as to perform mathematical operations, and the '298 Patent does not purport to describe a new technology for performing such basic computing functions." ECF No. 135, at 7.

Of course, "the machine-or-transformation test, by itself, it not sufficient to render a claim patent-eligible, as not all transformations or machine implementations infuse an otherwise ineligible claim with an 'inventive concept,'" *DDR Holdings*, 773 F.3d at 1256, but it remains a "useful clue," *Bancorp*, 687 F.3d at 1278. Intellectual Ventures focuses on the PTO's allowance of the claims during prosecution, when it applied the machine-or-transformation test. ECF No. 134, at 11. But, that prosecution occurred pre-*Alice* so the PTO's reliance on that test is of limited value here. *See* ECF No. 134-4 (patent prosecution documents from 2005). Intellectual Ventures' arguments are further belied by the text of the '298 Patent itself which mentions "any type of computing device," a "simple file deletion program," and "numerous possible algorithms."[8] And as discussed above, the source code is not specifically claimed. Therefore, the Court concludes that the '298 Patent does not "somehow change or improve the computer itself." *See Erie I*, 134 F. Supp. 3d at 916. The abstract idea claimed in the '298 Patent is implemented

---

[8] Here too, "[p]reemption concerns are a central factor, as the second step is geared toward weeding out claims that would monopolize, or preempt, use of the abstract idea itself through artful drafting." *Erie I*, 134 F. Supp. 3d at 898 (citing *Alice*, 134 S. Ct. at 2357). Such broad claims run a real risk that the '298 Patent would preclude any attempt to design another system for identifying and categorizing potentially illicit files.

19

on a generic computer, is directed to patent-ineligible subject matter, and lacks an inventive concept.

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that the '298 Patent is directed to patent-ineligible subject matter. Therefore, Erie's Motion to Dismiss will be granted, and the Complaint will be dismissed with prejudice.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated:  August 4, 2016
cc:      All counsel of record

20

US007757298B2

## (12) United States Patent
Shuster

(10) Patent No.: **US 7,757,298 B2**
(45) Date of Patent: ***Jul. 13, 2010**

(54) **METHOD AND APPARATUS FOR IDENTIFYING AND CHARACTERIZING ERRANT ELECTRONIC FILES**

(76) Inventor: **Gary Stephen Shuster**, 2067 Manzanita Dr., Oakland, CA (US) 94611

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1383 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/145,125**

(22) Filed: **Jun. 3, 2005**

(65) **Prior Publication Data**
US 2005/0228795 A1    Oct. 13, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/561,751, filed on Apr. 29, 2000, now Pat. No. 6,922,781.

(60) Provisional application No. 60/132,093, filed on Apr. 30, 1999, provisional application No. 60/142,332, filed on Jul. 3, 1999, provisional application No. 60/157,195, filed on Sep. 30, 1999.

(51) Int. Cl.
*G06F 7/04*    (2006.01)

(52) **U.S. Cl.** ............................. **726/30**; 726/26; 713/165

(58) **Field of Classification Search** .................. 726/22, 726/26, 30; 713/189, 165, 188
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,864,616 A | * | 9/1989 | Pond et al. | ................... 713/165 |
| 5,519,865 A | * | 5/1996 | Kondo et al. | ................... 707/1 |
| 5,530,757 A | * | 6/1996 | Krawczyk | ................... 713/188 |
| 5,809,138 A | | 9/1998 | Netiv | |
| 5,832,208 A | | 11/1998 | Chen et al. | |
| 5,835,722 A | * | 11/1998 | Bradshaw et al. | ........... 709/225 |
| 5,905,800 A | | 5/1999 | Moskowitz et al. | |
| 5,978,791 A | * | 11/1999 | Farber et al. | ................... 707/2 |
| 5,983,351 A | * | 11/1999 | Glogau | ........................ 726/26 |
| 5,996,113 A | * | 11/1999 | Korn et al. | .................. 714/807 |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO9825373    *    6/1998

(Continued)

OTHER PUBLICATIONS

Kalker et al, "Music2Share—Copyright-Compliant Music Sharing in P2P Systems", IEEE, Jun. 2004, p. 961-960.*

*Primary Examiner*—Ponnoreay Pich
(74) *Attorney, Agent, or Firm*—Knobbe Martens Olson & Bear, LLP

(57)    **ABSTRACT**

A computer system includes a, server having a memory connected thereto. The server is adapted to be connected to a network to permit remote storage and retrieval of data files from the memory. A file identification application is operative with the server to identify errant files stored in the memory. The file identification application provides the functions of: (1) selecting a file stored in said memory; (2) generating a unique checksum corresponding to the stored file; (3) comparing said unique checksum to each of a plurality of previously generated checksums, wherein the plurality of previously generated checksums correspond to known errant files; and (4) marking the file for deletion from the memory if the unique checksum matches one of the plurality of previously generated checksums.

**16 Claims, 6 Drawing Sheets**



**US 7,757,298 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,081,897 | A | * | 6/2000 | Bersson ........................ 726/32 |
| 6,182,081 | B1 | * | 1/2001 | Dietl et al. .................. 707/102 |
| 6,209,097 | B1 | * | 3/2001 | Nakayama et al. .......... 713/193 |
| 6,236,768 | B1 | * | 5/2001 | Rhodes et al. .............. 382/306 |
| 6,289,341 | B1 | * | 9/2001 | Barney ........................... 707/6 |
| 6,510,513 | B1 | * | 1/2003 | Danieli ........................ 713/156 |
| 6,530,022 | B1 | * | 3/2003 | Blair et al. .................. 713/186 |
| 6,577,920 | B1 | | 6/2003 | Hypponen et al. |
| 6,643,696 | B2 | | 11/2003 | Davis et al. |
| 6,922,781 | B1 | | 7/2005 | Shuster |
| 7,120,274 | B2 | * | 10/2006 | Kacker et al. .............. 382/100 |
| 2002/0087885 | A1 | * | 7/2002 | Peled et al. ................. 713/201 |
| 2005/0108248 | A1 | * | 5/2005 | Natunen ...................... 707/10 |

### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| WO | | WO9842098 | * | 9/1998 |

* cited by examiner

U.S. Patent        Jul. 13, 2010        Sheet 1 of 6        US 7,757,298 B2



FIG. 1



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 3

U.S. Patent      Jul. 13, 2010      Sheet 6 of 6      US 7,757,298 B2



FIG. 4

US 7,757,298 B2

**1**

## METHOD AND APPARATUS FOR IDENTIFYING AND CHARACTERIZING ERRANT ELECTRONIC FILES

### RELATED APPLICATIONS

This application is a continuation of application Ser. No. 09/561,751 filed Apr. 29, 2000, now U.S. Pat. No. 6,922,781, which claims priority pursuant to 35 U.S.C. §119(e) to U.S. Provisional Application Nos. 60/132,093, filed Apr. 30, 1999; 60/142,332, filed Jul. 3, 1999; and 60/157,195, filed Sep. 30, 1999. All of the foregoing non-provisional and provisional applications are specifically incorporated by reference herein, in their entirety.

### COPYRIGHT NOTICE

This patent document contains material subject to copyright protection. The copyright owner, Ideaflood, Inc., has no objection to the reproduction of this patent document or any related materials, as they appear in the files of the Patent and Trademark Office of the United States or any other country, but otherwise reserves all rights whatsoever.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to electronic files stored on computers, and more particularly, to methods and apparatus for identifying and characterizing errant electronic files stored on computer storage devices.

2. Description of Related Art

The use of public and shared computing environments has proliferated due to the popularity of the Internet. Many Internet service providers (ISP) offer Web hosting services at low or no cost in which registered users can place their own Web sites on the ISP's servers. These individual Web sites allow users to store and access electronic files that are uploaded to the servers. As a result of this proliferation, the administration of the large number of stored electronic files has become an important aspect of such Web hosting services. In view of the relative ease of public access to these electronic file storage resources, there is also widespread abuse of Web server space in which users upload files that are offensive, illegal, unauthorized, or otherwise undesirable and thus wasteful of storage resources. These file types are predominantly of four types: music, video, software and graphics. Many such files may contain pornography in violation of the terms of use of the Web hosting service. Moreover, the copying of these files to the Web server may be in violation of U.S. copyright laws. Consequently, the identification and removal of such files represents a significant administrative burden to the Web hosting services. In addition, the presence of certain files (such as depictions of child pornography or copyrighted music files) on user computers on corporate networks poses great legal risks to the corporation.

Such files can be selected for review and characterized as acceptable or unacceptable to the system administrator using an automated or manual process. Unfortunately, many undesirable files are not easily recognizable and cannot be detected and characterized. A manual review of the content of the files stored on the storage resource is usually not economically feasible, and is also not entirely effective at identifying undesirable files. Illicit users of Web hosting services have devised numerous techniques for disguising improper files wherein even easily recognizable file types are disguised as less recognizable file types. One such technique for disguis-

**2**

ing files is to split them into parts so that (i) they cannot be detected by simple searches for large files, and (ii) they can be downloaded or uploaded in smaller chunks so that if a transfer is interrupted, the entire download or upload is not lost. The split files may also be renamed so as to hide their true file type. For example, a search for oversized music files (*.mp3) would not turn up a huge file named "song.txt" because it appears to the system as a text file.

Another technique for hiding files is to append them to files that legitimately belong on a web server. By way of example, a Web site may be created called "Jane's Dog's Home Page." Jane gets ten small pictures of her dog, converts them to a computer readable format (for example, jpeg) and saves them on her computer. She then splits stolen, copyrighted software into ten parts. She appends each part to the end of one of the jpeg files. She then uploads these to a web server. Upon a manual review of the web page, the administrator of the site would not notice that the otherwise innocuous dog pictures actually contain stolen software, because each of the files would in fact display a photo of a dog. Thus, even if the files were reported for manual review by software doing a simple search for oversized files, the files would be left on the server because they appear to be legitimate. While these files can sometimes be identified by name or size alone, these methods lead to unacceptable numbers of false positives and false negatives as file sizes and names are changed.

Free and low cost web hosting services typically rely on advertising revenue to fund their operation. An additional abuse of these web hosting services is that they can be circumvented such that the advertisements are not displayed. Typically, the advertising content is displayed on text or hypertext pages. If a user stores graphics or other non-text files on a free web hosting server, yet creates a web page elsewhere on a different service that references these graphics or non-text files, the free web hosting service pays the storage and bandwidth costs for these files without deriving the revenue from advertisement displays.

A need exists, therefore, to provide a method and apparatus for identifying and characterizing errant electronic files stored on computer storage devices, that makes use of a variety of file attributes to reliably characterize files according to pre-set criteria, that is not easily circumvented, and that reduces the amount of manual review necessary to verify proper operation.

### SUMMARY OF THE INVENTION

In accordance with the teachings of the present invention, a method and apparatus are provided for identifying and characterizing files electronically stored on a computer storage device. More particularly, an embodiment of the invention further comprises a computer system that includes a server having a memory connected thereto. The server is adapted to be connected to a network to permit remote storage and retrieval of data files from the memory. A file identification application is operative with the server to identify errant files stored in the memory. The file identification application provides the functions of: (1) selecting a file stored in said memory; (2) generating a unique checksum corresponding to the stored file; (3) comparing said unique checksum to each of a plurality of previously generated checksums, wherein the plurality of previously generated checksums correspond to known errant files; and (4) marking the file for deletion from the memory if the unique checksum matches one of the plurality of previously generated checksums.

A more complete understanding of the method and apparatus will be afforded to those skilled in the art, as well as a

US 7,757,298 B2

3

realization of additional advantages and objects thereof, by a consideration of the following detailed description of the preferred embodiment. Reference will be made to the appended sheets of drawings that will first be described briefly.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating a wide area network in which a web host delivers information in the form of web pages to users;

FIG. **2A** is a flow chart illustrating a method of scanning a file directory to identify suspect files stored in a database in accordance with an embodiment of the invention;

FIG. **2B** is a flow chart illustrating a method of reviewing file contents to identify suspect files;

FIG. **2C** is a flow chart illustrating a method of checksumming the suspect files;

FIG. **3** is a flow chart illustrating a method of generating checksum values; and

FIG. **4** is a flow chart illustrating a method of generating a checksum library.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention satisfies the need for a method and apparatus for identifying and characterizing errant electronic files stored on computer storage devices, that makes use of a variety of file attributes to reliably characterize files according to pre-set criteria, that is not easily circumvented, and that reduces the amount of manual review necessary to verify proper operation. In the detailed description that follows, like element numerals are used to describe like elements illustrated in one or more of the figures.

Referring first to FIG. **1**, a block diagram is illustrated of a wide area network in which information is delivered to users in the form of web pages. It is anticipated that the present system operates with a plurality of computers that are coupled together on a communications network, such as the Internet or a wide area network. FIG. **1** depicts a network that includes a user computer **120** that communicates with a Web host **110** though communication links that include the Internet **102**. The user computer **120** may be any type of computing device that allows a user to interactively browse websites, such as a personal computer (PC) that includes a Web browser application **122** executing thereon (e.g., Microsoft Internet Explorer™ or Netscape Communicator™). The Web host **110** includes a server **112** that can selectively deliver graphical data files in the form of HyperText Markup Language (HTML) documents to the user computer **120** using the HyperText Transport Protocol (HTTP). Currently, HTML 2.0 is the standard used for generating Web documents, though it should be appreciated that other coding conventions could also be used within the scope of the present invention. The server **112** accesses HTML documents stored within a database **116** that can be requested, retrieved and viewed at the user computer via operation of the Web browser **122**. The database **116** may also contain many other types of files, including text, graphics, music, and software files. It should be appreciated that many different user computers may be communicating with the server **112** at the same time.

As generally known in the art, a user identifies a Web page that is desired to be viewed at the user computer **120** by communicating an HTTP request from the browser application **122**. The HTTP request includes the Uniform Resource Locator (URL) of the desired Web page, which may corre-

4

spond to an HTML document stored on the database **116** of the Web host **110**. The HTTP request is routed to the server **112** via the Internet **102**. The server **112** then retrieves the HTML document identified by the URL, and communicates the HTML document across the Internet **102** to the browser application **122**. The HTML document may be communicated in the form of plural message packets as defined by standard protocols, such as the Transport Control Protocol/ Internet Protocol (TCP/IP). A user may also download any other type of file from the database **116** in the same manner.

FIG. **1** further illustrates a secondary Web host **130** having a server **132** and database **134** similar to that of the primary Web host **110**. The user computer **120** can communicate with the secondary Web host **130** in the same manner as described above. Moreover, the primary Web host **110** can communicate with the secondary Web host **130** in the same manner. The pertinence of this communication path will become more clear from the following description of the present method. The Web host **110** further comprises a file identification application **114** that analyzes the data files stored on the database **116** in order to identify errant files in accordance with the present invention. The file identification application **114** may comprise a program executing on the same computer as the server **112**, or may be executing on a separate computer. The file identification application tests various attributes of the files stored on the database to determine whether they satisfy a particular profile that corresponds to an errant file. Source code for a preferred embodiment of a file identification application is attached hereto as an exhibit.

A widely accepted characteristic of the Internet is that files are copied relentlessly and without permission. This is particularly true of illicit files, such as adult content, pornographic material or illegally copied software, music or graphics. Thus, a photograph showing up on a single Web site may be propagated to hundreds of other Web sites within days. Although the file name is often changed, and transmission errors often result in premature truncation of the file (and thus a new file length), the initial portion of the file remains identical as it is propagated throughout the Internet. Another characteristic of the Internet is that illicit files, such as music, video and software, all have one common attribute—they are very large once reassembled. It is therefore necessary to (i) identify oversized files that have been uploaded in parts, and (ii) identify "hidden" files that are appended to otherwise legitimate files. As will be further described below, an aspect of the present invention takes advantage of these characteristics of the Internet.

Referring now to FIGS. **2A**-**2C**, a method for identifying and characterizing files is illustrated in accordance with an embodiment of the invention. The method would be executed by the file identification application **114** described above with respect to FIG. **1**. FIG. **2A** illustrates an exemplary method of scanning a file directory to identify suspect files stored in a database. Suspect files are ones that are suspected of being improper, and are marked for further testing. The database **116** includes a directory that identifies the files stored therein based on various attributes, including file name and file size. It will be appreciated from the following discussion that the method of FIGS. **2A**-**2C** relates specifically to the identification of pornographic materials in view of the particular selection criteria that is utilized; however, it will be understood to persons of ordinary skill in the art that the selection criteria can be modified to identify other types of illicit files. Starting at step **202**, the application traverses the directory in order to analyze the numerous directory entries. The application may construct a relational database of the directory entries in order to sort on the various fields of the directory. This step may be

US 7,757,298 B2

5

performed repeatedly as a continuing process through this identifying process, and would have to be repeated periodically to identify new files that are added to the database **116**.

At step **204**, the application determines whether there are any sequentially numbered files within the directory. Sequential files can be identified by analyzing and comparing the file names to each other. One attribute of pornographic materials is that they are often uploaded to a server as part of a series of photographs. Thus, the file names may include an embedded numerical designation such as "xxx001.jpg" or "xxx002.jpg". The user may define at what level of folders the software will look for sequentially numbered, lettered, or otherwise identified files. For example, if a file server is divided into folders lettered from "AA" to "ZZ", and each folder contains Web sites with names in which the first two letters correspond to the name of the file folder, the user could decide to treat all folders on the server as a single Web site, or to treat only Web sites within the same folder as a single Web site, or to treat each Web site individually. In the preferred embodiment, each Web site is considered on its own without reference to other Web sites, although the invention need not be limited in this manner.

If any such sequential files are identified, they are reported as suspect files at step **206**. Then, the application returns to step **202** and continues traversing through the directory entries. If no sequential files are identified at step **204**, the application next determines at step **208** whether there are any files having identical file sizes. Another attribute of stolen intellectual property materials such as music files is that they are often broken up into several pieces in order to thwart their detection by simple searches for large files, and also to enable them to be downloaded or uploaded in smaller chunks to facilitate transfer. The presence of two or more files having identical file size within the directory, is an indicator that they may be pieces of a single, larger, illicit file. If there are plural files with identical file sizes, the application determines at step **210** whether the total size of the identical files summed together would exceed a predetermined threshold. As noted above, illicit files tend to be unusually large, so the predetermined threshold would be selected to correspond with the largest size of a typical non-illicit file. If the total size does exceed the predetermined threshold, then the identical files are reported as suspect files at step **206**.

More particularly, the application may manipulate the file names to determine whether they are in fact likely to be parts of a single, larger file. An alternative way to determine whether files should be aggregated is to delete all numbers from the file names. Any files that are identically named after the elimination of all numbers would be marked as potentially responsive and their names and aggregate size would be reported. Of course, this can be limited to numbers in conjunction with specified letters (such as r00, r41, etc., as the "r" denotation often indicates file compression and division via the RAR method). Similarly, this can be limited to specified file types (whether identified by the file type suffix to the file name, or by examination of the actual contents of the file) or files other than specified types (for example, legitimate graphics files such as *.jpg are often sequentially numbered and may be a good candidate for exclusion). Next, using the original list of file names, any files are identified that differ only by a user-defined number of characters. Such files would be marked as potentially responsive and their names and aggregate size would be reported. Both of the foregoing methods can be set to either ignore the file suffix or file type information or to utilize it. Next, using the original list of file names and sizes, files that are of the same size (or within a user-defined number of bytes of being of the same size) are

6

identified. Any such files are marked as potentially responsive and their names and aggregate size would be reported.

If no identical files are identified at step **208**, or if the total size does not exceed the predetermined threshold at step **210**, the application proceeds to step **212** where it is determined whether the file names contain any suspect tags. An example of a suspect tag is "xxx" which is often used in association with pornographic materials. Another example of a suspect tag is "crc", which refers to a cyclical redundancy check (CRC), i.e., a known error checking technique used to ensure the accuracy of transmitting digital data. When a large file has been broken up into plural smaller files, it is common to include a CRC file in order verify the accurate reconstruction of the large file. The presence of a file having a "crc" tag is an indicator that an illicit or illegal file has been uploaded to the server. A table of predetermined suspect tags may be generated and periodically updated to reflect current usage within Internet newsgroups, Web sites and other facilities for trafficking in pornographic or illicit materials. If any file names containing suspect tags are identified, then the associated files are reported as suspect files at step **206**.

If no suspect tags are identified at step **212**, the application proceeds to step **214** where it is determined whether the file is referenced in any HTML file contained within the directory. Ideally, the files stored on the database would each be linked to HTML files contained within the directory. Where a file is not linked to a local HTML file, this is an indicator that a user is storing graphics or other non-text files that are linked to a Web page hosted elsewhere on a different server. As described above, this situation is undesirable since the free web hosting service pays the storage and bandwidth costs for these files without deriving the revenue from advertisement displays. Accordingly, any file names that are not referenced in an HTML file contained within the directory are reported as suspect files at step **206**. Alternatively, every file bearing a file type capable of causing a web browser to generate hypertext links (i.e. *.htm, *.html, *.shtml, etc.) may also be reviewed. The hypertext links may be then compared against a list of illegal links (for example, links to such a site is reported as suspect. If all files on the directory are properly referenced in HTML files or contain no illegal links, the application determines whether the end of the directory has been reached at step **216**. If the end of the directory is not yet reached, the application returns to step **202** to continue traversing the directory and identifying suspect files. Otherwise, this portion of the application ends at step **218**.

Once a review of the directory entries is complete, the next step is to review the content of the files listed on the directory to see if additional files should be added to the suspect file list. This review may address every file listed on the directory not already listed on the suspect file list, or may be further narrowed using particular selection criteria specific to the type of illicit file, i.e., pornography, copyright infringement, etc. FIG. **2**B illustrates an exemplary method of reviewing file contents. At step **220**, the application retrieves a file from the directory. At step **222**, the retrieved file is examined to identify whether the file contains a copyright notice or the symbol ©. The presence of a copyright notice in the file is an indicator that the file has been uploaded to the server unlawfully, and likely contains graphics, text, software or other material that is protected by copyright. Any files containing the copyright notice would be reported as a suspect file and added to the suspect file list at step **224**. This copyright notice check procedure can also be used to ensure compliance with appropri-

US 7,757,298 B2

7

ate copyright laws. Alternatively, the file can be simply marked for deletion. The application then returns to step **220** and retrieves the next file.

If the file does not contain a copyright notice, the application passes to step **226**, in which the retrieved file is examined to determine whether the file structure is as expected for a file of the indicated type. For example, the file type "jpg" should contain a header structure with the values "255 216 255 224". Alternatively, files can be checked to ensure that they actually contain the type of data described by the file type marker (i.e., a file named *jpg should contain a jpg image). If the file does not match the indicated file type, the file can be reported as a suspect file and added to the suspect file list at step **224**, or simply marked for deletion. Another alternative approach would be to replace files containing data of a type different than that indicated by their file type marker by a file stating that the original file was corrupted. Yet another approach would be to retype the file (i.e. *jpg can be retyped to *.zip if it contained a zipped file and not a jpg). Further, certain file types can be aggregated. For example, *.gif and *.jpg files may be aggregated as a single file type, and a file bearing a *.jpg type is considered valid if it contains either a gif or a jpg image. This greatly reduces the problem of mistakenly deleting a file that a consumer has innocently misnamed. The application then returns to step **220** and retrieves the next file.

If the file contents do match the indicated file type, the application determines at step **228** whether the file contains data extending past the end of data marker. If this marker appears before the true end of file, then it is likely that the additional data following the end of data marker constitutes a portion of an illicit file. At step **230**, the file is truncated at the end of file marker. The application then returns to step **220** and retrieves the next file. If the file does not contain data past the end of data marker, the application proceeds to step **232** in which it is determined whether the end of the directory has been reached. If there are still additional files in the directory to review, the application returns to step **220** and retrieves the next file. If there are no additional files, the file content review process ends at step **234**.

After the files within the directory have been reviewed and a list of suspect files generated, the next step is to checksum the suspect files and compare the results against a library of checksum values corresponding to known illicit files. The generation of this list of known illicit files will be described below with respect to FIG. **4**. FIG. **2C** illustrates an exemplary method of checksumming the suspect files. A checksum is a unique number based upon a range or ranges of bytes in a file. Unlike checksums as they are traditionally used in the computing field, the checksum described herein is not related to the total number of bytes used to generate the number, thus reducing a traditional problem with checksums, namely that similar file lengths are more likely to generate the same checksum than are dissimilar file lengths. In a preferred embodiment of the invention, two separate checksums are generated for a file corresponding to two different length portions of the file. While it is possible that the first checksum based on a shorter length portion of the file may falsely match the checksum of another file, it is highly unlikely that the second checksum would result in a false match. In addition, the use of an initial checksum based upon a small amount of data, reduces the burden on the network and file server. This reduction is a result of the ability to disqualify a file that does not match the first checksum without the need to read the larger amount of data necessary to generate the second checksum.

More particularly, at step **240**, the application retrieves a file from the database identified on the suspect file list. Then,

8

at step **242**, the application reads a first portion of the suspect file. In an embodiment of the invention, the first portion comprises the first one-thousand (1,024) bytes of the file. A first checksum based on this first portion is generated at step **244**. The first checksum is then compared to a library of known checksum values at step **246**, and at step **248** it is determined whether there is a match between the first checksum and the library. This step provides an initial screen of a file. If there is no match, then the file likely does not correspond to a known illicit file. The file may nevertheless constitute improper or unlawful material, and it may therefore be advisable to manually review the file to evaluate its contents. If the file does contain improper or unlawful material, its checksum may be added to the library of known checksums and the file marked for deletion from the database. Conversely, if the manual review does not reveal the file to be improper or unlawful, or based simply on the negative result of the first checksum comparison, the file is removed from the suspect file list, and the application returns to step **240** to retrieve the next file from the suspect file list.

If there is a match based on the initial screen of the file, the application proceeds to step **250** in which a second portion of the file is read. In an embodiment of the invention, the second portion comprises the first ten-thousand (10,240) bytes of the file. A second checksum based on this second portion is generated at step **252**. The second checksum is then compared to a library of known checksum values at step **254**, and at step **256** it is determined whether there is a match between the second checksum and the library. This step provides a more conclusive determination as to whether the file corresponds to a known improper or unlawful file. If there is a match, the file is marked for deletion (or other treatment) at step **258**, and the application returns to step **240** to retrieve the next suspect file. If there is not a match, the file is removed from the suspect file list, and the application again returns to step **240** to retrieve the next suspect file.

The files that are marked for deletion may be listed along with the pertinent information in a database (either via numerous individual files, an actual database such as SQL Server, or otherwise). This database may be manually reviewed and files that should not be deleted removed from the database. A simple file deletion program may then be run that deletes any file in the database.

As noted above, the first one-thousand bytes and the first ten-thousand bytes are used for the two checksums, respectively. For most applications, the use of the entire file or a larger portion of the file is not necessary and indeed may slow the process; however, there is no reason why the entire file or any other subset of the file could not be used. In an alternative embodiment, the first and last portions of the file are used for checksumming, although premature file truncation then becomes a way to defeat the screen. It is also possible to use other data to improve the quality of the initial screen, such as the length of the file and the file name. Any file matching the initial screen criteria is then checked against one or more checksum tests. Yet another alternative embodiment is to simultaneously generate both the initial screen checksum and the confirmation checksum in a single file read, thereby reducing the number of distinct disk access events. Verification is optional when the initial screen is performed using a checksum, as the checksum denotes a nearly certain match.

In an alternative embodiment of the invention, the present method for identifying and characterizing files can be used to block music piracy on the Internet. Each music CD carries certain identifying data that permits unique identification of that CD. MP3 encoders can be configured to encode this information into the first bytes of each MP3 file. As such, the

US 7,757,298 B2

9

MP3 file would carry the signature of the music CD it was created from. This would permit a scan of all files on a server for the signature code of a particular CD. When such a code is found, it can be checked against a database of copyrighted music and any matches marked for deletion and/or review. An alternative embodiment would be to prevent MP3 players from working property unless the unique identifier from a CD is found, and that unique identifier can be checked for validity against a checksum or an Internet database.

There are numerous possible algorithms that may be utilized to generate a checksum, with an exemplary algorithm shown in FIG. 3. At step 302, a single byte of the file is read. The byte is then multiplied by the current value of the checksum at step 304. On the first pass through the algorithm, a value of one is used for the current value of the checksum. Next, at step 306, the result of the previous step is reversed (e.g., 1234 becomes 4321). At step 308, the result of the previous step is truncated to a predetermined number of digits (e.g., with the predetermined number of digits being nine, 1,234,567,890 becomes 123,456,789). At step 310, the algorithm determines whether the predetermined number of bytes has been reached. As described above, checksums are performed using the first one-thousand (1,024) and ten-thousand (10,240) bytes in accordance with a preferred embodiment of the invention. If the predetermined number of bytes has not been reached, the algorithm returns to step 302 and continues with the next byte. Conversely, if the predetermined number of bytes has been reached, the algorithm ends at step 312. An advantage of this algorithm is that the checksum that is generated is independent of the number of bytes that are utilized. This way, the likelihood of false matches is substantially reduced even though the same number of bytes are used to calculate the checksums.

It should be appreciated to persons having ordinary skill in the art the many other types of algorithms could be utilized to achieve results specific to certain types of files. In an alternative embodiment of the invention, checksums of graphics files may be generated based on vector graphics analysis of the files. The graphics file may be reduced to its vector graphics components. The resulting vector graphics image is then reduced to a checksum representing the vector graphics image. The checksum is then checked against a list of checksums generated in a similar matter against known or suspected inappropriate images.

An alternative method of generating a unique checksum for a graphics file is by dividing an image into quadrants or other blocks and comparing the relationships between the zones into which the image is divided. For example, the relative ratio of red to green, green to blue, and blue to red in each of the zones may be calculated, and then recorded. A file could then be altered in a minor way (such as by altering several bits) without defeating the ability of the software to find the file.

Referring now to FIG. 4, an exemplary process is illustrated for generating the library of checksum values. At step 402, a source of known illicit files is identified. This may be performed by manually reviewing files already stored on the database 116 of the Web host 110, such as the files identified as suspect (see FIGS. 2A-2B). Alternatively, sources of illicit files outside of the Web host 110 may be sought, such as located on a secondary Web host 130. Certain Web servers may be assumed to contain files matching the criteria (i.e., a Web host that accepts adult content and runs adult oriented ads over that content will contain nearly entirely adult material). Alternatively, a target newsgroup (e.g., alt.binaries.pictures.erotica.female) can provide a source of illicit files. Once an adequate source of files is identified, checksum values are

10

generated at step 404 in the same manner as described above with respect to FIG. 3. Then, at step 406, the checksum is stored in a library along with the file name and file length. Lastly, at step 408, it is determined whether there are other files associated with the identified source of files that can be checksummed in order to further enlarge the library. As will be further described below, the identification of a single source of illicit material will invariably lead to other sources of material. Thus, the library can be expanded at an exponential rate. The process of FIG. 4 is repeated for each new source of illicit material. If no additional source files can be located, the process terminates at step 410.

Once a single file is located matching a predefined criteria (i.e., adult content), it is almost certain that other files also matching the same criteria will be found together with or in proximity to the original matching file (e.g., a Web site having one pornographic photograph will likely contain others with it). All files located with the matching file can be automatically checksummed, or can be checksummed after a manual review. Thus, the library of checksums is expanded. In view of the nature and prevalence of illicit material on the Internet, it is also likely that the matching files will also appear on other Web sites, and will thus lead to other files meeting the selection criteria that can themselves be checksummed. The expansion of the checksum library is thus exponential, and nearly the entire body of illicit materials on the Internet can be checksummed in this manner. This checksum amplification method in the automated checksumming modality can be further refined by requiring that any given checksummed file appear together with a minimum number of other checksummed files on a minimum number of Web sites before the file represented by the checksum is considered to match the selection criteria.

It should be appreciated that one cannot defeat the present invention by simply altering an illicit image file. Although the alteration of an image file may prevent it from matching an existing checksum, the altered image will invariably be copied and posted on a new Web site together with unaltered, checksummed images, and will be inevitably checksummed using the foregoing process. Furthermore, the process can be modified so as to allow automated checksumming with a greatly reduced risk of the generation of checksums for files that do not match the selection criteria. One approach is to set a file size floor and ceiling and/or file type limitation. Another approach is to create and maintain a list of excluded files, including all publicly available "clip art" and popular mainstream advertising banners, as well as files that show up frequently on legitimate Web sites. Yet another alternative approach is to require an image to appear in proximity to known illicit files, such as files that match existing checksums, a minimum number of times before being added to the checksum library.

Furthermore, certain graphics are quite common in certain types of Web sites. For example, pornographic Web sites almost always contain a "banner" advertising membership in a commercial pornography Web site. There is a very limited universe of such banners. By generating checksums for all available pornographic banners, it is possible to locate nearly all pornographic web sites. Using the checksum amplification method described above, these advertising banner checksums would quickly lead to a very comprehensive catalog of pornographic material checksums. Similarly, illegally copied software sites often have "warez" banners. Other target file types have banners and common graphics associated with them as well.

Files matching the selection criteria can also be located by searching for hyperlinks to checksummed files or to sites

US 7,757,298 B2

**11**

known to contain inappropriate material. Thus, whenever a checksum is matched, the URL of the material located is recorded. Any HTML page that links to that material is then identified as likely containing material matching the selection criteria. All other graphics referenced by that HTML page and/or in the same Web site may then be automatically check-summed or flagged for manual review and checksumming.

Certain key words may also be searched for on a Web site. Thus, for example, the word "fuck" in close association with "lolita" should flag a site as likely to contain child pornography. This method is better used in conjunction with a manual review so as to avoid checksumming files that do not match the selection criteria, although it can also be used as an enhancement to the checksum amplification method to confirm that checksums should be automatically generated.

The results of these searches can be returned in a regular text file. Alternatively, the results may be returned in a formatted HTML file that interconnects with the file management system. The HTML file should display a copy of all files on a given Web site matching the checksum(s), all user information as well as other sites using the same password, with the same user name, with the same IP address, or the same e-mail address, and the options to delete the site(s), modify the records, delete the materials, etc. Furthermore, for those file types that cannot be graphically displayed by a Web browser, the "server" modality (see code attached as Exhibit) should be used to return a "file present" or "file absent" graphic to indicate whether the file is present or absent.

In an alternative embodiment of the invention, the present method for identifying and characterizing files may be implemented in a real-time manner to review files as they are uploaded to the Web server. In yet another embodiment of the invention, the present method for identifying and characterizing files may be used to check the contents of desktop computers within a business. Thus, for example, with file and access permissions set correctly, the software could determine whether pornography, child pornography, copyrighted software, or other problematic materials exist on the computers used by employees. Appropriate reporting could then be accomplished. This can also be accomplished by running the software in a standalone package on desktop computers (by parents, for example). For file systems that require locally running software, the software can also be combined with necessary software (for example, the detection software could also serve as the e-mail program for the user, or as the mechanism whereby the user logs into their main server).

An important advantage of the use of checksums to identify and characterize illicit files is that the customer service employees of a Web hosting company can determine with certainty that a file contains illegal contents without actually viewing the file. This is particularly important in retaining employees, as many individuals can become uncomfortable or disturbed by having to view illicit, violent or illegal images. For example, by having a library of child pornography checksums, the computer can simply report "child porn found", and no employee need ever see the image. The customer service employees can then load the illegal file onto a disk to deliver to law enforcement, and terminate the customer account. Another advantage of using the checksums is that it eliminates the need for the Web hosting company to maintain copies of illegal or contraband files in order to verify that files match them. Thus, it is unnecessary to keep a copy of an illegal picture or stolen music file in order to check whether files found on the server match the illicit files.

Lastly, the present method for identifying and characterizing files could be used to provide automatic notification to Web host customers and other interested parties. Any time a

**12**

file is reported as illegal, a database containing a list of customer data may be accessed to obtain the e-mail address of the site operator. An automated e-mail message may be generated (optionally copied to the Web hosting company's staff) indicating that the site has been marked for review and/or deletion. Alternatively, the fax number of the customer may be accessed and the same message sent via fax. Alternatively, the phone number may be accessed and a text-to-voice system used to send an automated telephone message. Alternatively, postal mail may be printed with the customer's address and the same message.

Having thus described a preferred embodiment of a method and apparatus for identifying and characterizing errant electronic files, it should be apparent to those skilled in the art that certain advantages have been achieved. It should also be appreciated that various modifications, adaptations, and alternative embodiments thereof may be made within the scope and spirit of the present invention. The invention is further defined by the following claims.

What is claimed is:

**1**. A computer-implemented method for identifying and characterizing stored electronic files, said method comprising:

under control of one or more configured computer systems:
selecting a file from a plurality of files stored in a computer storage medium, wherein selecting the file is performed according to at least one of:

selecting the file based on the size of the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold;

selecting the file based on whether content of the file matches a file type indicated by a name of the file; or

selecting the file based on whether the file comprises data beyond an end of data marker for the file;

generating an identification value associated with the selected file, wherein the identification value is representative of at least a portion of the content of the selected file;

comparing the generated identification value to one or more identification values associated with one or more of a plurality of unauthorized files; and

characterizing the file as an unauthorized file if the identification value matches one of the plurality of identification values associated with the unauthorized files.

**2**. The computer-implemented method of claim **1**, further comprising selecting the file from one of a plurality of sequentially-ordered files in a directory of the computer storage medium.

**3**. The computer-implemented method of claim **1**, wherein generating an identification value comprises generating a checksum.

**4**. The computer-implemented method of claim **3**, wherein generating an identification value comprises generating a first checksum corresponding to a first portion of said stored file and a second checksum corresponding to a second portion of said stored file.

**5**. The computer-implemented method of claim **3**, wherein generating an identification value comprises generating a first checksum corresponding to a first portion of said stored file and a second checksum corresponding to a larger portion of said stored file that includes the first portion.

**6**. The computer-implemented method of claim **1**, further comprising processing a plurality of known unauthorized files to generate the plurality of identification values.

**7**. The computer-implemented method of claim **1**, further comprising presenting the identified unauthorized file for human review prior to disposing of it.

US 7,757,298 B2

| 13 | 14 |

**8**. The computer-implemented method of claim **1**, further comprising automatically notifying a third party that the file has been identified.

**9**. The computer-implemented method of claim **1**, further comprising deleting the identified unauthorized file from the computer storage medium.

**10**. A computer system, comprising:

a server having a memory connected, thereto, said server being adapted to be connected to a network to permit remote storage and retrieval of data files from the memory; and

a file identification application operative with the server to identify unauthorized files stored in the memory, the file identification application providing the functions of:

selecting a file from a plurality of files stored in the memory, wherein selecting the file is performed according to at least one of:

selecting the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold;

selecting the file based on whether content of the file matches a file type indicated by a name of the file; or

selecting the file based on whether the file comprises data beyond an end of data marker for the file;

generating an identification value associated with the selected file, wherein the identification value is representative of at least a portion of the content of the selected file;

comparing the generated identification value to one or more identification values associated with one or more of a plurality of unauthorized files; and

characterizing the selected file as an unauthorized file if the identification value matches one of the plurality of identification values associated with the unauthorized files.

**11**. The system of claim **10**, wherein the application further comprises the function of selecting the file from one of a plurality of sequentially-ordered files in a directory of the computer storage medium.

**12**. The system of claim **10**, wherein the application further comprises the function of selecting the file from a plurality of files stored in the computer storage medium, based on size of the file.

**13**. The system of claim **10**, wherein generating an identification value comprises generating a checksum.

**14**. The system of claim **13**, wherein generating an identification value comprises generating a checksum corresponding to a first portion of the selected file and a second checksum corresponding to a second portion of the selected file.

**15**. The system of claim **13**, wherein generating an identification value comprises generating a first checksum corresponding to a first portion of the selected file and a second checksum corresponding to a larger portion of the selected file that includes the first portion.

**16**. A non-transitory computer-readable storage medium having instructions stored thereon that, in response to execution by a computing device, cause the computing device to perform a operations comprising:

selecting a file from a plurality of files stored in a computer storage medium, wherein selecting the file is performed according to at least one of:

selecting the file based on the size of the file by determining whether an aggregate size of plural identically-sized files exceeds a predetermined threshold;

selecting the file based on whether content of the file matches a file type indicated by a name of the file; or

selecting the file based upon whether the file comprises data beyond an end of data marker for the file;

categorizing the selected file as an unauthorized file based on a comparison of an identification value associated with the selected file with one or more identification values associated with one or more of a plurality of unauthorized files.

\*   \*   \*   \*   \*

# United States Court of Appeals
# for the Federal Circuit

*Intellectual Ventures I LLC v. Erie Indemnity Company,* 2017-1147

## CERTIFICATE OF SERVICE

I, Christian John Hurt, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **January 17, 2017**, I caused the foregoing **BRIEF FOR APPELLANTS** to be filed with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

> Gregory H. Lantier
> (Principal Counsel)
> Richard A. Crudo
> Wilmer Hale
> 1875 Pennsylvania Avenue, NW
> Washington, DC 20006
> 202-663-6000
> gregory.lantier@wilmerhale.com
> richard.crudo@wilmerhale.com
> *Counsel for Appellees,*
> *Erie Indemnity Company, et al.*

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

January 17, 2017                    /s/ Christian John Hurt
                                    Christian John Hurt
                                    *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 9,426, excluding the parts  of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac in Times New Roman 14 point font.

Date: January 17, 2017

/s/ Christian Hurt

_____

Christian Hurt
*Attorney for Appellant*